## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

CHELSEA C. GROWE,

                                    Plaintiff,

        v.                                          5:24-CV-1014
                                                  (BKS/MJK)

OSWEGO COUNTY SUPREME COURT,

                                    Defendant.

---

CHELSEA C. GROWE, Plaintiff, pro se

MITCHELL J. KATZ, U.S. Magistrate Judge

### ORDER and REPORT-RECOMMENDATION

**TO THE HONORABLE BRENDA K. SANNES, CHIEF U.S. DISTRICT JUDGE:**

The Clerk has sent to the court for review a complaint, together with an application to proceed in forma pauperis ("IFP"), filed by pro se plaintiff, Chelsea Growe. (Dkt. Nos. 1, 2).

## I.    IFP Application

Plaintiff declares in her IFP application that she is unable to pay the filing fee. (Dkt. No. 2). After reviewing her application, this court finds that plaintiff is financially eligible for IFP status.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall

1

dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915.  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

2

U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."  *Id.* (citing *Bell Atl. Corp.*,

550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and

plain statement of the claim showing that the pleader is entitled to relief."  Although

Rule 8 does not require detailed factual allegations, it does "demand[] more than an

unadorned, the-defendant-unlawfully-harmed-me accusation."  *Houston v. Collerman*,

No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016)

(quoting *Iqbal,* 556 U.S. at 678).  A pleading that contains allegations that "'are so

vague as to fail to give the defendants adequate notice of the claims against them' is

subject to dismissal."  *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir.

2009)).

## II.  **Complaint**

Liberally construed, plaintiff's complaint names Oswego County Supreme Court

as the defendant in this action. [1]  (Compl. at 1-2).  Plaintiff alleges that she wants an

---

[1] In the caption of her complaint, plaintiff includes the initials "DMV" beneath named defendant
Oswego County Supreme Court.  (Compl. at 1).  The only defendant listed in the relevant section of
the complaint itself is "Oswego County Courthouse." (*Id.* at 2).  To the extent plaintiff has identified
the Oswego County Supreme Court by its address in the body of the complaint, the court construes
Oswego County Supreme Court to be the intended defendant in this matter.  Moreover, considering the
context of plaintiff's allegations, the court surmises that in referring to "DMV," plaintiff is attempting
to reference the domestic violence court within the Oswego County Court system, which is sometimes
referred to as "DV" or "IDV" court.

3

"order protection [sic] dropped against Adam Hamilton."  (*Id*. at 3).  She goes on to state that:

> Between the two parties this is the first Domestic on File as we have been together for 10 years.  Hamilton is mentally unstable which he his [sic] on medication also doing [counseling].  This has caused damaged [sic] to myself and children as the judge nor DA will reduce the order to a B or will not drop it.  As Chelsea Growe has asked for it to be dropped and the judge will not.  Mr. Hamilton and Ms. Growe are the only family we have.

(*Id.*).

## III.   Discussion

A court's initial review of a complaint under section 1915(e) must encompass the applicable standards of the Federal Rules of Civil Procedure.  Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must contain:

> (1) a short and plain statement of the grounds for the court's jurisdiction . . . ;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a). Here, putting aside the other pleading deficiencies, plaintiff's complaint fails to comply with Rule 8 as it does not provide a basis for the court's jurisdiction.  The factual allegations suggest that plaintiff is asking this court to vacate an order of protection purportedly issued by Oswego County Supreme Court.   Plaintiff does not include a specific allegation of a federal constitutional or statutory violation

4

that would present a basis for exercising federal question jurisdiction here.  Indeed,

plaintiff has not referenced a federal statute or right at all.  Nor does the court appear to

have diversity jurisdiction over this case since plaintiff and the purported defendant are

alleged to be residents of New York. (Compl. at 3). "It is well established that for a case

to come within the diversity statute there must be complete diversity among all parties;

that is, no plaintiff and no defendant may be citizens of the same state." *Airlines*

*Reporting Corp. v. S & N Travel, Inc.*, 58 F.3d 857, 861 (2d Cir. 1995); *see also*

*OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 218 (2d Cir. 2016).  Because it is not

clear that this court has jurisdiction over plaintiff's complaint, it should be dismissed.

Moreover, even if the court extended the utmost liberality in order to construe

plaintiff's complaint to assert a cause of action under 42 U.S.C. § 1983, the court would

still lack subject matter jurisdiction over plaintiff's claim pursuant to the *Rooker-*

*Feldman* Doctrine. It is well settled that the *Rooker-Feldman* doctrine precludes lower

federal courts from exercising jurisdiction over claims that seek to "collaterally attack"

– *i.e.* reverse or modify – a state court judgment. *See Lipko v. Christie,* 94 Fed. App'x

12, 14 (2d Cir. 2004) (citing *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415-16, 44 S.

Ct. 149, 68 L.Ed. 362 (1923) and *D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 482

n. 16 (1983)); *Davis v. Baldwin,* 12-CV-6422, 2013 WL 6877560, (S.D.N.Y. Dec. 31,

2013) (applying *Rooker-Feldman* doctrine to review "collateral attack" of Family Court

Order); *Anghel v. N. Y. State Dep't of Health,* 947 F. Supp. 2d 284 (E.D.N.Y. May 29,

2013) (*Rooker-Feldman* "mandates that a federal district court may not review collateral attacks upon a state court determination.")

The Second Circuit has delineated four requirements for *Rooker-Feldman* to apply: (1) "the federal-court plaintiff must have lost in state court"; (2) "the plaintiff must complain of injuries caused by a state-court judgment"; (3) "the plaintiff must invite district court review and rejection of that judgment"; and (4) "the state-court judgment must have been rendered before the district court proceedings commenced." *Hoblock v. Albany County Bd. of Elecs.*, 422 F.3d 77, 85 (2d Cir. 2005) (internal quotations and alterations omitted). Here, to the extent plaintiff seeks to void a standing state court protective order, her federal complaint is an improper procedural vehicle.

Finally, even if plaintiff could overcome the jurisdictional issues in this matter, the court defendant would be entitled to immunity under the Eleventh Amendment. The Eleventh Amendment provides that "[t]he judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." *Caruso v. Zugibe*, 646 F. App'x 101, 104 (2d Cir. 2016) (citing *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (quoting *Regents of the Univ. of Cal. v. Doe,* 519 U.S.

6

425, 429 (1997))). The Second Circuit has consistently held that "the New York State Unified Court System is unquestionably an 'arm of the State.' " *Id.* (quoting *Gollomp v. Spitzer,* 568 F.3d 355, 368 (2d Cir. 2009)). As part of the New York State Unified Court System, the Oswego County Supreme Court is entitled to Eleventh Amendment immunity.

There are three exceptions to Eleventh Amendment immunity, which apply where (1) Congress has abrogated the state's sovereign immunity, (2) the state has consented to suit, or (3) a plaintiff is "seeking injunctive relief against a state official for an ongoing violation of law or the Constitution,"  otherwise known as the *Ex Parte Young* doctrine.  *N.Y. State Corr. Officers & Police Benevolent Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 124–25 (N.D.N.Y. 2012) (citing *Ex Parte Young*, 209 U.S. 123, 154 (1908)). As relevant to this case, it is well-established that Congress did not abrogate states' immunity when it enacted § 1983, *see Quern v. Jordan*, 440 U.S. 332, 343–45 (1979), and that New York State has not waived immunity from suit on the §1983 claims plaintiff could conceivably assert based on the alleged facts, *see, e.g., LoPorto v. Cnty. of Rensselaer*, No. 15-CV-866, 2018 WL 4565768, at *6 (N.D.N.Y. Sept. 24, 2018); *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39–40 (2d Cir. 1977).

As for the third exception, the *Ex Parte Young* doctrine is inapplicable to plaintiff's claim because the Oswego County Supreme Court is not an individual, and

the *Ex Parte Young* doctrine is only applicable to suits seeking declaratory and injunctive relief against state officials, not a branch of government. *See New York Communities for Change v. New York State Unified Ct. Sys./Off. of Ct. Admin.*, 680 F. Supp. 3d 407, 414 (S.D.N.Y. 2023) (indicating that claims invoking the *Ex Parte Young* doctrine "must name a state official who has 'some connection with the enforcement of the act' as a defendant, not the state or state agency alone, as is the case here.") (quoting *Loren v. Levy*, No. 00-CV-7687 (DC), 2003 WL 1702004, at *11 (S.D.N.Y. Mar. 31, 2003)); *Kelly v. New York State Unified Ct. Sys.*, No. 21-1633, 2022 WL 1210665, at *2 (2d Cir. Apr. 25, 2022) ("Kelly sued the [unified court system] in lieu of individual officers . . . . *Ex parte Young*'s exception to the sovereign immunity bar—allowing prospective injunctive relief—therefore does not apply."); *Mann v. New York State Ct. of Appeals*, No. 1:21-CV-49 (MAD/CFH), 2021 WL 5040236, at *5 (N.D.N.Y. Oct. 29, 2021) ("[T]he Supreme Court has made clear that this exception only contemplates action brought against individual defendants in their official capacities, and "has no application in suits against the States and their agencies, which are barred regardless of the relief sought.") (quoting *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)).

IV.   **Opportunity to Amend**

Generally, before the court dismisses a pro se complaint or any part of the complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

The court is recommending dismissal of this action for lack of subject matter jurisdiction. Thus, any dismissal must be without prejudice. *Hollander v. Garrett*, 710 F. App'x 35, 36 (2d Cir. 2018). This court has serious doubts about whether plaintiff can amend to assert any form of federal jurisdiction over the situation that plaintiff describes in her complaint. As there appears no basis for plaintiff to raise her claim against Oswego County Supreme Court in federal court, the court should not allow plaintiff to amend, notwithstanding a dismissal without prejudice. Because lack of subject matter jurisdiction is a substantive defect, *Deul v. Dalton*, No. 1:11-CV-0637(GTS/RFT), 2012 WL 235523, at *8 n.19 (N.D.N.Y. Jan. 25, 2012), the court recommends dismissal without leave to amend.

**WHEREFORE**, based on the findings above, it is

9

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) be **GRANTED**,[2] and it is

**RECOMMENDED**, that the complaint be **DISMISSED WITHOUT PREJUDICE BUT WITHOUT LEAVE TO AMEND** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.[3]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: August 23, 2024

Mitchell J. Katz
U.S. Magistrate Judge

---

[2] The court notes that although plaintiff's IFP application has been granted, plaintiff will still be required to pay fees that she may incur in the future regarding this action, including but not limited to copying and/or witness fees.

[3] The Clerk shall also provide plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Davis v. Baldwin, Not Reported in F.Supp.2d (2013)

2013 WL 6877560

2013 WL 6877560
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyreek DAVIS, on behalf of N. Brown, S.
Brown, I. Davis and A. Davis, Plaintiff,
v.
Chini BALDWIN (in her official and individual capacity
as Caseworker), Amanda E. White (in her individual
and official capacity as Justice of the Superior Court
Kings County), John Mattingly (in his individual and
official capacity as Commissioner of ACS), Defendants.

No. 12–CV–6422 (ER).
|
Dec. 31, 2013.

**OPINION AND ORDER**

RAMOS, District Judge.

**\*1** Plaintiff Tyreek Davis ("Plaintiff"), appearing *pro se,*
brings this civil rights action pursuant to 42 U.S.C. §
1983 against Defendants Chini Baldwin ("Baldwin") and
John Mattingly ("Mattingly") (collectively, "Defendants"),[1]
alleging violations of his Fourth, Ninth and Fourteenth
Amendment rights. Complaint ("Compl.") (Doc. 1.) The
Court previously deemed this case as related to another action
initiated by Plaintiff and his wife, *Tasha O. Licorish–Davis,
et al. v. Dr. Millicent Mitchell, et al.,* 12 Civ. 601 (the "Related
Case"), which the Court dismissed on May 20, 2013 ("May
20, 2013 Opinion and Order").

[1]     On October 3, 2012, the Court dismissed Judge
        Amanda E. White from this action under the
        doctrine of absolute judicial immunity. Doc. 9.

Currently pending before the Court is Defendants' motion
to dismiss the instant action for lack of subject matter
jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), as well as for
failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Doc.
23. For the reasons set forth below, Defendants' motion to
dismiss is GRANTED.

**I. Factual Background**

As the factual background of the instant action and the
Related Case are substantially similar, the parties' familiarity
with the facts-which are set forth in this Court's May 20,
2013 Opinion and Order-is presumed. The Court has set forth
below only those facts alleged by Plaintiff in support of the
instant action that were not set forth in the prior Opinion.

Plaintiff alleges that after his daughter, Aaliyah's, admission
to the hospital following a "scald accident," a case was
initiated by the New York City Administration for Children's
Services ("ACS") against his wife, Tasha Licorish–Davis, in
June 2011, pursuant to which Aaliyah was removed from
the custody of Ms. Licorish–Davis, remanded to the custody
of ACS, and placed in foster care. Compl. at III; *see also*
Declaration of Jeffrey S. Dantowitz ("Dantowitz Decl.")
(Doc. 24), Ex. A (June 13, 2011 Order of Removal).[2]
Plaintiff claims that he was never served or subpoenaed by
the Family Court, as it did not have his correct address. Compl.
at III. As Plaintiff explained to Defendant Baldwin, Plaintiff
never resided at Ms. Licorish–Davis's mother's apartment in
Brooklyn, where the accident occurred, as he was "abiding
by a two year order [of protection]," which expired on July
28, 2012. *Id.; see also* Dantowitz Decl., Ex. B (July 28,
2010 Order of Protection). Plaintiff claims that he was not
given any notice of the pendency of the Family Court action,
nor did he consent to personal jurisdiction in the Family
Court. Compl. at III. He alleges that this "defective service
has affected all [his] children ... forcing them illegally into
the custody of the City of N.Y." *Id.* Plaintiff further claims
that Defendant Baldwin defamed his character in court in
order to have his children removed from his wife's custody,
as well as "unlawfully" added Plaintiff's name to the Family
Court petition in order to prevent him from gaining custody
of Aaliyah, who was not included in the 2010 Order of
Protection. *Id.* Plaintiff alleges that Baldwin "lied about
[Plaintiff's] address [in order] to have [his] name improperly
added to the petition in family court." *Id.* Plaintiff claims that
he has never appeared in Family Court, was never served with
process, and was not aware of the court action. *Id.*

[2]     As discussed *infra,* on a Rule 12(b)(1) motion,
        the court may consider documents outside the
        pleadings. *Zappia Middle E. Constr. Co. v. Emirate
        of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000).
        Accordingly, in addition to the allegations in the
        Complaint, the Court considers, to the extent
        relevant, the documents submitted by both parties

in determining whether this Court has subject matter jurisdiction over Plaintiff's action.

**\*2** On August 4, 2011, the Family Court issued an *Ex Parte* Temporary Order of Protection against Plaintiff, directing him not to interfere with the care and custody of his children. Dantowitz Decl., Ex. C. Plaintiff alleges that he was first informed of the Order of Protection on September 30, 2011, Compl. at III, but that he was never served with the Order. *Id.* Thereafter, on November 21, 2011, the Family Court issued another Temporary Order of Protection against Plaintiff. Dantowitz Decl., Ex. D. The Order indicates that Plaintiff was "present in Court" on the date of its issuance. *Id.*

Plaintiff claims that his family "has been sabotaged and conspired against" by the Defendants, "who placed restraining orders [against him] without [him] being present in court and without [his] knowledge." Compl. at III.

## II. *Legal Standard on a* Rule 12(b)(1) *Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case. Fed.R.Civ.P. 12(b)(1). The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) (citing *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, evidence outside of the pleadings, such as affidavits, may be considered by the court to resolve the disputed jurisdictional fact issues. *Zappia Middle E. Constr. Co.,* 215 F.3d at 253; *see also Morrison,* 547 F.3d at 170. When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true, but does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the court must consider the Rule 12(b)(1) motion first. *Baldessarre v. Monroe–Woodbury Cent. Sch. Dist.,* 820 F.Supp.2d 490, 499 (S.D.N.Y.2011), *aff'd sub nom. Baldessarre ex rel. Baldessarre v. Monroe–Woodbury Cent. Sch. Dist.,* 496 F. App'x 131 (2d Cir.2012).

## III. *Plaintiff's Claims are Barred by the Rooker–Feldman Doctrine*

Defendants argue that Plaintiff's action is an impermissible collateral attack of a state Family Court Order, and is therefore barred by the *Rooker–Feldman* doctrine. [3]

[3] The Second Circuit has held that "[a] challenge under the *Rooker–Feldman* doctrine is for lack of subject matter jurisdiction." *Moccio v. N.Y. State Office of Ct. Admin.,* 95 F.3d 195, 198 (2d Cir.1996).

The *Rooker–Feldman* doctrine stands for the principle that federal district courts lack jurisdiction over suits that are, in substance, appeals from state court judgments. *Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 84 (2d Cir.2005). The doctrine precludes cases brought in lower federal courts "by state-court losers complaining of injuries caused by statecourt judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005). In interpreting the Supreme Court's *Exxon Mobil* decision, the Second Circuit has held that there are four requirements for the application of *Rooker–Feldman:*

> **\*3** First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a statecourt judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court judgment must have been rendered before the district court proceedings commenced-i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Hoblock,* 422 F.3d at 85 (brackets, quotation marks and citations omitted). The first and fourth requirements "may be loosely termed procedural," while the second and third "may be termed substantive." *Id.*

#### a. Procedural Requirements

As indicated, the *Rooker–Feldman* doctrine contains two procedural requirements: the federal court plaintiff must have lost in state court and the state court judgment must have been rendered before the district court proceedings commenced. The Court finds that the procedural requirements are met in this case. First, Plaintiff "lost" in state court when the Family Court issued the Order of Removal placing Aaliyah in the custody of ACS and the Orders of Protection precluding Plaintiff from interfering with the care and custody of his children. *See J.R. ex rel. Blanchard v. City of New York,* No. 11 Civ. 841(SLT)(MDG), 2012 WL 5932816, at *4–*5 (E.D.N.Y. Nov. 27, 2012) (holding that the plaintiff "lost" in state court when the family court issued an order of disposition temporarily remanding custody of plaintiff's child to ACS); *Allen v. Mattingly,* No. 10 Civ. 0667(SJF)(ARL), 2011 WL 1261103, at *8 (E.D.N.Y. Mar. 29, 2011) (holding that plaintiff "lost" in state court pursuant to both temporary and final orders of the family court removing plaintiff's son from her custody and placing him in foster care), *aff'd,* 479 F. App'x 712 (2d Cir.2012); *Bobrowsky v. Yonkers Courthouse,* 777 F.Supp.2d 692, 705–06 (S.D.N.Y.2011) (holding that plaintiff "lost" in state court when the court issued a protective order against her); *Phillips ex rel. Green v. City of New York,* 453 F.Supp.2d 690, 713 (S.D.N.Y.2006) (holding that plaintiffs "lost in state court" when the Family Court signed the temporary order of removal granting remand of plaintiffs' child to ACS pending further proceedings); *cf. Green v. Mattingly,* 585 F.3d 97, 102 (2d Cir.2009) (holding that plaintiff was not a "state court loser" for *Rooker–Feldman* purposes where temporary order of removal was vacated four days after it was issued and plaintiff's child was returned to her); *see also* Dantowitz Decl., Ex. A (noting that appeal of June 13, 2011 Order of Removal allowed as of right under Section 113 of the New York Family Court Act).

With respect to the fourth requirement, the Order of Removal-dated June 13, 2011–and Orders of Protection-dated August 4, November 21, and December 5, 2011–were issued before this action was commenced on August 1, 2012. Plaintiff indicates in his opposition papers that he has "appealed every order since *August 10, 2012,*" Doc. 28 at 2 (emphasis added), and attaches as exhibits two Requests for Appellate Division Intervention, dated August 15, 2012 and March 15, 2013. Doc. 29 at 36–37. It is unclear whether those requests for appellate intervention refer to the Orders at issue in this action, as the Orders about which Plaintiff complains in this litigation were issued in *2011*-months before August 10, 2012. The August 10, 2012 Order to which Plaintiff refers

in his opposition papers presumably relates to a separate incident that occurred after the filing of this action, in which police officers allegedly entered Plaintiff's hotel room and "executed an arrest warrant for [his] newborn."[4] Doc. 28 at 2. Moreover, even assuming those appeals refer to the Family Court Orders at issue in this case, Plaintiff has not provided this Court with any indication of the status of the appeals, including whether they have been resolved and, if so, how.

[4]     Plaintiff indicates in his submissions to this Court that he has filed a *separate* action in federal court regarding the August 10, 2012 incident against the New York City Police Department. Doc. 19 at 2.

**\*4** Defendants suggest that assuming such appeals relate to the Orders at issue in this case and are still pending, the *Rooker–Feldman* doctrine would not operate to preclude Plaintiff's instant action and, instead, argue in the alternative that the Court nevertheless lacks subject matter jurisdiction under the *Younger* abstention doctrine. *See* Reply Mem. L. (Doc. 30) at 3. Defendants' assumption that the *Rooker–Feldman* doctrine would not apply to Plaintiff's action if his appeals were still pending is presumably based on the body of case law holding that the doctrine is inapplicable unless all state proceedings-including appeals-have ended before the federal action commences. *See Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.,* 701 F.Supp.2d 340, 346 (E.D.N.Y.2010) (citing, *inter alia, Council v. Better Homes Depot, Inc.,* No. 04 Civ. 5620(NGG)(KAM), 2006 WL 2376381, at *8 (E.D.N.Y. Aug. 16, 2006) ("Therefore, the state court proceeding ends for *Rooker–Feldman* purposes after a plaintiff allows the time for appeal to lapse without filing an appeal in state court."); *Phillips ex rel. Green,* 453 F.Supp.2d at 714–15 (same))). However, courts have split as to whether the *Rooker–Feldman* doctrine applies to bar actions where the federal court plaintiff has an appeal pending in state court. *Id.* Some courts require exhaustion of state-court appeals, citing language in the Supreme Court's decision in *Exxon Mobil* stating that *Rooker–Feldman* applies only when "the losing party in state court filed suit in federal court *after the state proceedings ended.* ...."*Id.* at 347 (citing cases and quoting *Exxon Mobil Corp.,* 544 U.S. at 291) (emphasis added)). Under the reasoning of these cases, state proceedings have not "ended" if state court appeals are still pending. *Id.*

Other courts, including several courts within this District, have applied *Rooker–Feldman* as long as the federal action seeks review of a previous state court judgment, *regardless* of whether that judgment is being appealed in the state courts

when the federal case begins. [5] *Id.* (citing *Schuh v. Druckman & Sinel, L.L.P.,* No. 07 Civ. 366(LAK)(GWG), 2008 WL 542504, at *5 (S.D.N.Y. Feb. 29, 2008) ("That the [plaintiffs] are still in the process of appealing the state court decision is irrelevant to the *Rooker–Feldman* analysis."); *Lomnicki v. Cardinal McCloskey Servs.,* No. 04 Civ. 4548(KMK), 2007 WL 2176059, at *6 n. 11 (S.D.N .Y. July 26, 2007); *Melnitzky v. HSBC Bank USA,* 06 Civ. 13526(JGK), 2007 WL 1159639, at *8 n. 6 (S.D.N.Y. Apr. 17, 2007); *Bush v. Danziger,* No. 06 Civ. 5529(PKC), 2006 WL 3019572, at *6 (S.D.N.Y. Oct. 23, 2006))). These courts reason that despite *Exxon Mobil'* s use of the phrase "after the state proceedings ended," that decision makes clear that *Rooker–Feldman* prevents federal district courts from "review[ing] and revers[ing] unfavorable state-court *judgments.*" *Id.* (citing *Exxon Mobil,* 544 U.S. at 283) (emphasis added)). This purpose would therefore be undermined if the doctrine is held to be inapplicable where a litigant seeks state appellate review of a statecourt judgment while concurrently seeking federal district court review of that same judgment. *Id.* at 348.

[5]     Although the Second Circuit has not directly addressed the issue, a summary order in *Swiatkowski v. New York,* 160 F. App'x 30 (2d Cir.2005), suggests that the doctrine does apply to bar federal suits brought while a state court appeal is pending. *Id.* (upholding district court's determination that *Rooker–Feldman* barred the suit where appeal "remained pending" at the time the plaintiffs removed the suit from state court).

**\*5** This Court finds the latter approach more persuasive. Regardless of the status of any state court appeals, plaintiff is still seeking federal review of a state-court judgment, and that is what *Rooker–Feldman* prohibits. *Id.* (citing *Exxon Mobil Corp.,* 544 U.S. at 283) (explaining that *Rooker–Feldman* prevents "federal courts of first instance [from] review[ing] and revers[ing] unfavorable state-court judgments")). Thus, even although Plaintiff's appeals are currently pending before the Appellate Division, to the extent Plaintiff challenges the Orders of the Family Court, his claims relate to a state-court judgment "rendered before the district court proceedings commenced." [6]

[6]     Even if the Court were to hold that the purported pendency of Plaintiff's appeals precluded the application of the *Rooker–Feldman* doctrine, the Court would nevertheless abstain from involving itself in Plaintiff's pending state judicial proceeding

pursuant to the *Younger* abstention doctrine. The *Younger* abstention doctrine requires federal courts to abstain from jurisdiction in the "interests of comity and federalism ... whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests." *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 237–38 (1984). The Second Circuit has held that a federal court should abstain from interfering with pending state litigation when: (1) a state proceeding is ongoing; (2) an important state interest is implicated; and (3) the plaintiff has an open avenue for review in the state courts of his constitutional claims. *Gentner v. Shulman,* 55 F.3d 87, 89 (2d Cir.1995). The state court proceedings from which Plaintiff's claims stem involve family relations and the custody of children, which are important state interests. *See Cogswell v. Rodriguez,* 304 F.Supp.2d 350, 357 (E.D.N.Y.2004) (citing *Phifer v. City of New York,* No. 99 Civ. 4422, 1999 WL 722013, at *1 (S.D.N.Y. Sept. 16, 1999)). Although Plaintiff brings federal civil rights claims in this proceeding, he asserts no reason why he could not raise those claims in Family Court or on appeal. *Id.* Accordingly, assuming *arguendo* that Rooker–Feldman did not bar Plaintiff's instant action, the Younger abstention doctrine requires that this Court abstain from adjudicating Plaintiff's claims, which can be raised in the context of the pending proceedings in the New York State court system.

### b. Substantive Requirements

Even if the procedural requirements of the *Rooker–Feldman* doctrine have been satisfied, Plaintiff may nonetheless pursue his claims against Defendants if the substantive requirements are not also met. The two substantive requirements that must be satisfied for the *RookerFeldman* doctrine to apply are: (1) the plaintiff must complain of injuries caused by the statecourt judgment, and (2) the plaintiff must invite district court review and rejection of that judgment. The Second Circuit has summarized these two requirements as follows: "federal plaintiffs are not subject to the *Rooker–Feldman* bar unless they *complain of an injury* caused by a state judgment." *McKithen v. Brown,* 481 F.3d 89, 97 (2d Cir.2007) (quoting *Hoblock,* 422 F.3d at 87) (emphasis in original)); *id.* at 98 ("[A] party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed *prior* in time to the state-

proceedings, and so could not have been 'caused by' those proceedings.") (emphasis in original). Accordingly, the doctrine does not bar plaintiffs from raising federal claims based on the same facts as a prior state case, although such claims might be barred under *res judicata,* so long as the plaintiff complains of an injury *independent* of an adverse state court decision; rather, the doctrine precludes claims brought in federal court where the state decision is *itself* the source of the injury complained of. *Mareno v. Dime Sav. Bank of New York,* 421 F.Supp.2d 722, 726 (S.D.N.Y.2006).

Here, Plaintiff alleges that the "basis of [his] suit/complaint" is Defendants' failure to serve him with the petition filed in Family Court alleging that Aaliyah was neglected and abused, and seeking the temporary removal of Aaliyah from Plaintiff's and his wife's custody. Compl. at III. In his prayer for relief, Plaintiff asks that this Court grant him "relief [from] all orders made in violation of the law," and that "due process of the law be allowed." Compl. at V. The Court finds that the substantive requirements of the *Rooker–Feldman* doctrine are satisfied here, as Plaintiff clearly complains of injuries caused by the Family Court Orders, and invites this Court to review and reject those Orders.[7] Plaintiff argues that he was not properly served with notice of the Family Court proceedings and that the Family Court Orders therefore violated his procedural due process rights.[8] The relief he seeks in this case would effectively reverse the state court's judgment placing Aaliyah in the custody of ACS. *See Morris v. Sheldon J. Rosen, P.C.,* No. 11 Civ. 3556(JG) (LB), 2012 WL 2564405, at *4–*5 (E.D.N.Y. July 2, 2012) (where plaintiff argued that she was not properly served with notice of holdover proceeding, holding that *Rooker–Feldman* "bars [plaintiff] from claiming that the state court [default] judgment violated her right to due process"); *MacPherson v. Town of Southampton,* 738 F.Supp.2d 353, 365 (E.D.N.Y.2010) (holding that plaintiff's action was barred by *Rooker–Feldman* where "a finding by this Court that Defendants' conduct violated Plaintiffs' due process rights would necessarily involve a review of the state court's determination that ... no notice was required before the [order] could be issued and/or ... the notice given to Plaintiffs by Defendants ... was constitutionally sufficient"); *Edem v. Spitzer,* No. 05 Civ. 3504(RJD), 2005 WL 1971024, at *1 (E.D.N.Y. Aug. 15, 2005) (holding that plaintiff's claim that he was denied due process because he was not given "adequate notice and an opportunity to be heard prior to the deprivation of his property rights" is "inextricably intertwined with the state court's determinations and could have been raised in state court, either in the Family Court or on appeal," and is therefore barred by the *Rooker–Feldman* doctrine),

*aff'd,* 204 F. App'x 95 (2d Cir.2006); *Cogswell v. Rodriguez,* 304 F.Supp.2d 350, 355–56 (E.D.N . Y.2004) (holding that due process and equal protection claims were inextricably intertwined with the Family Court's determinations regarding child support and could have been raised in state court, either in the Family Court or on appeal). Because the substantive requirements are satisfied here, this Court lacks subject matter jurisdiction over Plaintiff's action under the *Rooker–Feldman* doctrine.[9]

[7]
> To the extent that Plaintiff seeks damages for his § 1983 due process claim-as he contends in his opposition papers-that claim is nevertheless barred by *Rooker–Feldman,* as a plaintiff "cannot avoid dismissal of the complaint [pursuant to the *Rooker–Feldman* doctrine] by suggesting civil rights violations." *MacPherson v. Town of Southampton,* 738 F.Supp.2d 353, 366 (E.D.N.Y.2010) (citation omitted); *accord Bernstein v. New York,* No. 06 Civ. 5681(SAS), 2007 WL 438169, at *6 (S.D.N.Y. Feb. 9, 2007) (where plaintiff attempted to avoid the application of *Rooker–Feldman* by "present[ing] his claim as independent from his appeal of the state court ... order by stating that he ... was denied due process in the course of, and not *as a result of,* the judicial proceedings that led to the state court judgment," holding that the *Rooker–Feldman* doctrine nevertheless barred plaintiff's claim because "[i]f th[e] Court were to declare that [plaintiff] was denied due process during the state court proceedings, it would effectively be reversing a judgment of the state court") (emphasis in original); *Wu v. Levine,* No. 05 Civ. 1234(NG), 2005 WL 2340722, at *2 (E.D.N.Y. June 7, 2005) (holding that where "plaintiff's claims of constitutional and civil rights violations arise from the state court proceedings," plaintiff "cannot circumvent the *Rooker–Feldman* doctrine by recasting her claims as a federal civil rights violation"), *aff'd,* 314 F. App'x 376 (2d Cir.2009).

[8]
> With respect to Plaintiff's Fourth Amendment claim, the Court assumes that it relates to Defendants causing Aaliyah to be placed in the custody of ACS, although Plaintiff does not set forth the factual basis for the claim in the Complaint. This claim is barred for the same reason that Plaintiff's due process claim is barred; that is, it directly arises from the Family Court's

determination regarding Aaliyah's custody and is therefore precluded by the *Rooker–Feldman* doctrine. Moreover, even assuming the Court had jurisdiction over Plaintiff's Fourth Amendment claim, the Second Circuit has held that in the context of a seizure of a child by a state actor during an abuse investigation, "a court order is the equivalent of a warrant." *Tenenbaum v. Williams,* 193 F.3d 581, 602 (2d Cir.1999). The Family Court issued an Order removing Aaliyah from Plaintiff's custody on June 13, 2011. In carrying out that Order, Defendants were acting under the equivalent of a warrant, and Plaintiff's Fourth Amendment claim therefore fails for that independent reason. With respect to Plaintiff's Ninth Amendment claim, case law is clear that the Ninth Amendment does not independently secure any constitutional rights which may support a § 1983 claim. Accordingly, Plaintiff's Ninth Amendment claim must also be dismissed. *Barnett v. Carberry,* 420 F. App'x 67, 69 (2d Cir.2011) (holding that the Ninth Amendment does not provide "an independent source of individual rights; rather, it provides a rule of construction that we apply in certain cases") (citation omitted), *cert. denied,* 132 S.Ct. 248 (2011); *Bussey v. Phillips,* 419 F.Supp.2d 569, 586 (S.D.N.Y.2006) ("[T]he Ninth Amendment refers only to unenumerated rights, while claims under § 1983 must be premised on specific constitutional guarantees.").

9      That Plaintiff did not raise or adjudicate before the Family Court or on appeal the issues and claims he asserts in the instant case does not preclude application of the *Rooker–Feldman* doctrine. *Glatzer v. Barone,* 614 F.Supp.2d 450, 465 (S.D.N.Y.2009) (citing *Hoblock,* 422 F.3d at 86) (holding that "[j]ust presenting in federal court a legal theory not raised in state court ... cannot insulate a federal plaintiff's suit from *Rooker–Feldman"), aff'd,* 394 F. App'x 763 (2d Cir.2010). Moreover, to the extent that Plaintiff argues that he was unable to raise the issue in the state court proceedings because he was not present at the relevant hearings, the Court notes that the November 21, 2011 Temporary Order of Protection clearly states that Plaintiff was present at the hearing on the Order. *See* Dantowitz Decl., Ex. D. In his opposition papers, Plaintiff makes inflammatory and unsubstantiated accusations that

counsel for Defendants altered the November 21, 2011 Order to make it appear as though Plaintiff was present at the hearing. *See* Doc. 28 at 2–3. In support of this theory, Plaintiff includes a copy of a December 5, 2011 Temporary Order of Protection, *see* Doc. 29 at Ex. B, and contends that the handwriting on the top left portion of the December Order does not match the handwriting on the November Order. Accordingly, Plaintiff concludes that Defendants' counsel "doctored" the November Order to make it appear that Plaintiff was present at the hearing when, in reality, he was not. That the handwriting on the two separate Orders does not match-presumably written by two different employees within the Clerk's office-is clearly not indicative of fraud or bad faith on the part of Defendants' counsel. Notably, Plaintiff has failed to provide the Court with a copy of the allegedly un-altered, original November 21, 2011 Order. Moreover, even assuming Plaintiff was not present at any of the Family Court hearings, Plaintiff could have raised his due process argument on appeal.

## IV. *Plaintiff's Petition for Habeas Corpus is Denied*

**\*6** On May 21, 2013, Plaintiff filed with this Court a Petition for Habeas Corpus ("Petition") requesting that his children "be produced based on their unlawful detainment in the illegal custody of ACS." Doc. 26. Defendants submitted a letter, dated June 5, 2013, opposing Plaintiffs' Petition on several different grounds. Doc. 27.

This Court may "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In *Lehman v. Lycoming Cnty. Children's Servs. Agency,* 458 U.S. 502, 510–12 (1982), the Supreme Court held that children in foster care, like Plaintiff's children, are not in the "custody" of the state within the meaning of § 2254(a). Rather, "[t]hey are in the 'custody' of their foster parents in essentially the same way, and to the same extent, other children are in the custody of their natural or adoptive parents." *Id.* at 510. The Court explained that the "custody" of foster parents over a child is not the type of custody that traditionally has been challenged through federal habeas. *Id.* Accordingly, because Plaintiff's children are not in state "custody" within the meaning of § 2254, this Court does not have jurisdiction to review by means of a habeas application the state court's

custody determinations. *See Middleton v. Attorneys Gen. of States of N.Y. Penn.,* 396 F.3D 207, 209 (2d Cir.2005) (holding that federal courts do not have jurisdiction to review by means of a habeas application a states cort's child-custody determination). Accordingly, Plaintiff's Petition is DENIED.

### V. *Conclusion*

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. [10] Additionally, Plaintiff's Petition for Habeas Corpus is DENIED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 23, and close this case. [11]

[10] To the extent that Plaintiff raises a malicious prosecution claim against Defendants, that claim must also fail, as the Family Court proceedings clearly did not terminate in Plaintiff's favor. *O'Brien v. Alexander,* 101 F.3d 1479, 1484 (2d Cir.1996).

[11] The court remains cognizant that *pro se* litigants should be given leave to amend a complaint if "a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir2000) (citation omitted). However, as Plaintiff's claims stem directly from the state court judgment, and are therefore barred by the *Rooker–Feldman* doctrine, the Court finds that there is no "reason to believe that [Plaintiff]may be able to articulate aviable set of allegations" to support his claims, and that his claims, "however pled, are fatally flawed." *Santos v. Gen. Elec. Co.,* No. 10 Civ. 6948(JSR)(MHD), 2011 WL 5563544, at *12 (S.D.N.Y. Sept. 28, 2011) (Report & Recommendation), *adopted* 2011 WL 5563536 (S.D.N.Y. Nov. 15, 2011).

It is SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 6877560

---

**End of Document**                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

2018 WL 4565768
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael LOPORTO, Plaintiff,

v.

COUNTY OF RENSSELAER, et al., Defendants.

1:15-CV-0866 (LEK/DJS)
|
Signed 09/24/2018

**Attorneys and Law Firms**

John E. Sweeney, Attorney at Law, Albany, NY, for Plaintiff.

Crystal R. Peck, John W. Bailey, Bailey, Johnson PC, Thomas J. O'Connor, Andrew S. Holland, Diane Lufkin Schilling, Napierski, Vandenburgh Law Firm, Robert A. Becher, Office of Robert A. Becher, James E. Long, Office of James E. Long, William A. Scott, New York State Attorney General, Albany, NY, for Defendants.

John F. Brown, Troy, NY, pro se.

Daniel B. Brown, Green Island, NY, pro se.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

 *1  Plaintiff Michael LoPorto commenced this civil rights action against Rensselaer County, former officials, and several private individuals pursuant to 42 U.S.C. § 1983. Dkt. No. 1 ("Complaint"). [1] In the Complaint, Plaintiff alleges that defendants Rensselaer, Youel C. Smith III, Richard J. McNally, Jr., William A. McInerney, John F. Brown, Daniel B. Brown, and John J. Ogden violated and conspired to violate his rights under the United States Constitution and federal law. E.g., id. ¶¶ 1–3. Presently before the Court are five motions to dismiss the Complaint for failure to state a claim, Dkt. Nos. 24 ("Browns Motion"), 24-3 ("Brown Memorandum"), 29 ("McNally Motion"), 29-3 ("McNally Memorandum"), 40 ("McInerney Motion"), 40-2 ("McInerney Memorandum"), 57 ("Ogden Motion"), 57-2 ("Ogden Memorandum"), 66 ("Smith Motion"), 66-3 ("Smith Memorandum"), a motion for judgment on the pleadings, Dkt. No. 96 ("Rensselaer Motion"), 96-1 ("Rensselaer

Memorandum"), and the Browns' motion for sanctions, Dkt. Nos. 58 ("Sanctions Motion"), 58-2 ("Sanctions Memorandum"). For the reasons that follow, the Sanctions Motion is denied, and the remaining motions are granted.

[1]   The first paragraph of the Complaint states that this action is brought pursuant to 42 U.S.C. §§ 1983, 1984, 1985, and 1986. Compl. ¶ 1. Plaintiff's reliance on §§ 1984, 1985, and 1986 is misplaced. "Sections one and two of 42 U.S.C. § 1984 were declared unconstitutional by the Supreme Court in 1883, and sections three and four were repealed by Congress in 1948." Dennison v. Pa. Dep't of Corr., 268 F. Supp. 2d 387, 395 n.3 (M.D. Pa. 2003) (citing United States v. Singleton, 109 U.S. 3 (1883) ). Likewise, no subsection of § 1985—or, by extension, § 1986—appears relevant to Plaintiff's claims. "Section 1985(1) relates to conspiracies to interfere with a federal official in the performance of his or her duties," while§ 1985(2) prohibits interference in state proceedings by "force, intimidation, or threat," Butler v. Hesch, No. 16-CV-1540, 2018 WL 922187, at *20 (N.D.N.Y. Feb. 15, 2018), and a § 1985(3) claim requires "allegations of racial or other invidious class-based animus," Hernandez v. Goord, 312 F. Supp. 2d 537, 548 n.4 (S.D.N.Y. 2004) (citing United Bhd. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828–29 (1983) ). Plaintiff makes no such allegations. In any event, aside from the first paragraph, the Complaint contains no reference to §§ 1984, 1985, or 1986, and each cause of action is expressly brought pursuant to § 1983 only. See Compl. ¶¶ 47–100. Therefore, the Court construes the Complaint as alleging claims under § 1983.

**II. BACKGROUND**

**A. Factual Background**
The following facts are drawn from the allegations of the Complaint, which are accepted as true on a motion to dismiss. Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 408 (2d Cir. 2000); see also Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[ ] all reasonable inferences in her favor").

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 19 of 63

2018 WL 4565768

**\*2** This action stems from an alleged voter fraud scheme that came to light after the 2009 election in Troy, New York. At that time, Plaintiff, McInerney, and the Browns were "engaged in the political process by assisting the Working Class Party of the City of Troy by passing petitions and absentee voting applications relevant to the election of 2009."

Compl. ¶ 16. [2] At some point after the 2009 election, non-party Robert Mirch reported to Defendants and the New York State Police his belief "that forgeries on absentee ballots and absentee ballot applications occurred throughout August and September 2009." Id. ¶ 17. The State Police conducted an investigation, which produced evidence incriminating multiple individuals, including McInerney and the Browns. Id. ¶ 18. The evidence was provided to Rensselaer, the county in which Troy is situated. Id. Once word of the investigation became public, McInerney told "other political party operatives in the [Rensselaer County] Democratic Party," including McNally and the Browns, that "if he were involved in the prosecution, he was going to 'take everyone down with him.' " Id. ¶ 19.

[2]   It is unclear from the Complaint whether Plaintiff was involved in the Working Class Party or the Working Families Party in 2009. Compare Compl. ¶ 16 (referencing the "Working Class Party of the City of Troy"), with id. ¶ 44 (discussing the "2009 Working Families Party primary"). However, that inconsistency is immaterial to the motions presently before the Court.

McNally, who was the Rensselaer District Attorney at the time, decided to recuse himself from the voter fraud investigation. Id. ¶ 20. The New York State Supreme Court, Rensselaer County, granted McNally's request even though, according to Plaintiff, McNally provided "no apparent or least stated[ ] reason" to support his recusal application. Id. The Complaint alleges that McNally actually sought recusal because he

had reason to suspect that guilty parties involved in the prior elections of 2007 and 2008 and the current election of 2009 were Democratic operatives who had assisted him in his prior elections and had a very good chance of being implicated by a conspiracy of the false, fraudulent and forgery activities during elections in the City of Troy

which he either knew of or should have known of in the course of his own candidacy for District Attorney in 2007.

Id. Plaintiff maintains that the recusal was "clearly illegal." Id.

Following McNally's recusal, Smith was appointed Special Prosecutor to investigate the voter fraud allegations. Id. ¶ 21. Smith and McNally had previously worked together in the District Attorney's Office. Id. Plaintiff alleges that McNally "t[ook] steps to have" Smith appointed because he knew "Smith would work with him in making sure that Defendant McInerney and other operatives who assisted him in these type of false, fraudulent and forgery activities in previous elections were not implicated or involved." Id. As a result, "a conspiracy arose at the very beginning of the investigation and administration to cover up false, fraudulent and forgery behavior relative to the elections of 2007, 2008 and 2009 in the City of Troy." Id.

Plaintiff claims that Smith "utilized the false, fraudulent and coerced evidence obtained during his investigation and administration of this voter fraud case" to obtain a twenty-nine count grand jury indictment against Plaintiff. Id. ¶ 24. He further alleges that Defendants conspired to fabricate evidence against him in order to cover up the "clearly guilty activities" of other "Democratic operatives, including" McInerney and the Browns. Id. ¶ 23. In other words, Smith sought to "scapegoat" Plaintiff in order to protect political allies. Id. ¶¶ 23–25.

Ogden, a New York State Police investigator, id. ¶ 15, "uncovered no evidence" incriminating Plaintiff, but "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert" in an effort "to try to pin guilt on" Plaintiff, id. ¶ 29. In the course of their investigation, Smith and Ogden "forged[ ] and falsely created" affidavits "for the sole purpose of prosecuting the Plaintiff to cover up the obvious guilt of" McInerney and the Browns. Id. ¶ 30. The fabrication of evidence was "part of an unofficial policy allowed to exist, and not protected or instructed against," by" Rensselaer. Id. ¶ 43. Additionally, Smith "and others ... maliciously gave false statements and information to the press in order to coerce" Plaintiff to plead guilty. Id. ¶ 34.

Case 5:24-cv-01014-BKS-MJK  Document 4  Filed 08/23/24  Page 20 of 63
LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)
2018 WL 4565768

**\*3** Smith also learned "that there was a great deal of evidence against" McInerney and the Browns, as well as "other Democratic operatives." Id. ¶ 31. After the State Police uncovered evidence against McInerney and John Brown, Smith "went to the trouble of having his authority as Special Prosecutor extended to" McInerney so he "could soft peddle anything that [McInerney] faced and protect[ ] [him] from prosecution." Id. ¶ 43.

Despite being recused, McNally "met and consulted" with McInerney about the case, id. ¶ 35, and referred McInerney to an attorney, id. ¶ 37. Plaintiff also alleges that McNally "approached" a witness "in a completely illegal manner," id. ¶ 42, met with Smith to "discuss[ ] the case," took "custody of evidence and g[ot] DNA reports," told Democratic operatives, including McInerney and the Browns, that they would not be prosecuted, and made public statements supporting Smith and "adverse to" Plaintiff, id. ¶ 49.

Plaintiff was tried twice for crimes connected to the voter fraud scheme, and ultimately acquitted. Id. ¶ 41. Meanwhile, Smith offered McInerney and John Brown a generous plea deal "with no or little jail time." Id. ¶ 43. In connection with that deal, McInerney testified at Plaintiff's second trial, where he "admitted to guilt for forgeries during the 2009 Working Families Party primary," id. ¶ 44. McInerney was ultimately sentenced to ninety days of community service and five years of probation for his role in the scheme. Id. ¶ 45. John Brown received a sentence of six months incarceration, followed by five years of probation. Id.

**B. Procedural History**

Plaintiff commenced this action on July 15, 2015, alleging eight causes of action pursuant to § 1983. Compl. He claims that Defendants "deprived [him] of his civil rights," id. ¶ 47, "maliciously and intentionally deprived [him] of his civil and constitutional rights," id. ¶ 57, and acted "in violation of federal law," id. ¶ 65. Although not explicitly stated, Plaintiff seems to allege the following claims against Defendants: (1) malicious prosecution, id. ¶¶ 63–69, and conspiracy to maliciously prosecute in violation of the Fourth Amendment, id. ¶¶ 47–55, (2) "negligent investigation," id. ¶¶ 56–62, (3) abuse of process in violation of the Fourteenth Amendment, id., (4) "stigma-plus" defamation in violation of the Fourteenth Amendment, id. ¶¶ 70–78, (5) obstruction of a criminal investigation in violation of 18 U.S.C. § 1510, id. ¶¶ 79–82, (6) unlawful racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., Compl. ¶¶ 88–94, and

RICO conspiracy, id. ¶¶ 95–100. Plaintiff also alleges § 1983 municipal liability against Rensselaer under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). Compl. ¶¶ 83–87. [3]

[3]

> The Complaint appears to allege the Monell claim against all defendants. See Compl. ¶ 84 ("The actions and omissions of the Defendants described herein constitute valid Monell claims against the Defendants...."), ¶ 86 ("Pursuant to [§ 1983], Defendants are jointly and severally liable to Plaintiff in the sum of $5,000,000 ...."). Because a Monell claim is a vehicle for seeking relief under § 1983 from a municipality and its instrumentalities, e.g., Owen v. City of Indep., Mo., 445 U.S. 622, 635–36 (1980), the Court construes this cause of action as alleged against Rensselaer only. To the extent Plaintiff seeks to bring a Monell claim against the individual defendants, he fails to state a cognizable claim.

**\*4** Between September and December 2015, the Browns, McNally, McInerney, and Ogden moved to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Brown Mot.; McNally Mot.; McInerney Mot.; Ogden Mot. The Browns also moved for sanctions in December 2015. Sanctions Mot. Between the end of 2015 and mid-2016, the parties entered into settlement negotiations. But when, in July 2016, those negotiations stalled, Smith also moved to dismiss. Smith Mot.

In August 2016, the Court discovered a serious attorney conflict issue. At a settlement conference held on August 12, 2016, it came to light that Plaintiff's attorney, Paul F. Dwyer, had joined the law firm of Cooper Erving & Savage LLP, which represented the Browns. Dkt. No. 83 ("2016 Order") at 2. On November 16, 2016, the Court disqualified Dwyer and Cooper Erving from representation and appearance in this case and stayed the action to allow Plaintiff and the Browns to obtain new counsel. Id. at 7. The Court also afforded Plaintiff and the Browns an opportunity to request additional briefing in the event they determined that their prior attorneys' papers were inadequate. Id.

The Browns did not secure new counsel, opting to proceed pro se. Docket. On January 24, 2017, Plaintiff's new attorney, John J. Sweeney, requested an extension of time in which to "familiarize [him]self with the prior proceedings in the matter." Dkt. No. 89 ("Extension Request"). The Court denied

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

the Extension Request because Sweeney was not admitted to practice in this District. Dkt. No. 90. Two months later, Sweeney, now admitted to appear before the Court, submitted a notice of appearance. Dkt. No. 91. In April 2017, he submitted a seven page supplemental brief in opposition to the pending motions to dismiss. Dkt. No. 93 ("Supplemental Brief"). In June 2017, Rensselaer moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Rensselaer Mot., which Plaintiff opposed, Dkt. No. 97 ("Rensselaer Opposition").

Between June 2017 and August 2018, settlement negotiations resumed. As a result, multiple conferences were held before the Court to discuss the parties' progress and the likelihood of their reaching a settlement. See, e.g., Dkt Nos. 101, 106, 107. At the final such conference, held August 30, 2018 (the "August 2018 Conference"), the parties confirmed that no settlement was reached, and the Court informed the parties that motion practice would resume. Dkt. No. 108 ("August 2018 Conference Transcript") at 3. Sweeney then requested that, "should the motions to dismiss be granted," the Court grant Plaintiff "leave for 30 days to refile [his] papers." Id. That request was objected to by Smith's counsel. Id. at 4. Finally, Sweeney informed the Court that he had accepted a position with Rensselaer County and would, therefore, be withdrawing as Plaintiff's counsel. Id. at 3.

## III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556.

**\*5** The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility

of the alleged misconduct based on the pled facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79. [4]

[4]  Rensselaer has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Rensselaer Mot. at 1. "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases).

## IV. DISCUSSION

Plaintiff brings this action pursuant to § 1983, which "provides a civil claim for damages against any person who, acting under color of state law, deprives another of the right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; it provides civil litigants a procedure to redress the deprivation of rights established elsewhere. Id. "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right." Id.

### A. Malicious Prosecution and Conspiracy Claims

Plaintiff's first claim is for malicious prosecution and conspiracy to maliciously prosecute in violation of the Fourth Amendment, brought pursuant to § 1983. Compl. ¶¶ 47–55, 63–69. When analyzing a malicious prosecution claim under § 1983, a court "adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." Cornejo v. Bell, 592 F.3d 121, 129 (2d Cir. 2010). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997) ).

To establish a § 1983 conspiracy, "a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v.

Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (collecting cases). A private party is deemed to have acted under color of state law if he conspires with a state actor to violate a plaintiff's constitutional rights. Charlotten v. Heid, No. 09-CV-891, 2011 WL 3423826, at *11 (N.D.N.Y. Aug. 4, 2011) (Kahn, J.). To survive dismissal, a complaint alleging a § 1983 conspiracy must allege more than "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights." Ciambriello v. Cty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) (quoting Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993) ).

### 1. McNally and Smith

#### a. *Eleventh Amendment Immunity*

**\*6** Plaintiff sues McNally and Smith in their official and individual capacities. Compl. ¶¶ 10–11. McNally argues that he is immune from the official capacity claims under the Eleventh Amendment. McNally Mem. at 6–7.

The Eleventh Amendment provides that "[t]he judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens." Edelman v. Jordan, 415 U.S. 651, 662–63 (1974) (collecting cases). Sovereign immunity is lost when a state explicitly consents to suit or Congress "unequivocal[ly]" abrogates immunity. Chayoon v. Chao, 355 F.3d 141, 143 (2d Cir. 2004). It is well-settled that Congress did not abrogate states' immunity when it enacted § 1983, e.g., Quern v. Jordan, 440 U.S. 332, 343–45 (1979), and New York State has not waived immunity from suit on the claims Plaintiff asserts, e.g., Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 39–40 (2d Cir. 1977). Although Smith does not assert an Eleventh Amendment defense, the Court "may raise the issue of Eleventh Amendment immunity sua sponte." Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ., 466 F.3d 232, 238 (2d Cir. 2006).

"When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988), cert. denied, 488 U.S. 1014 (1989). To the

extent he is sued in his official capacity, Smith stands in the shoes of the recused prosecutor. See Aretakis v. Durivage, No. 07-CV-1273, 2009 WL 249781, at *27 (N.D.N.Y. Feb. 3, 2009) (noting that a special prosecutor is "an independent contractor standing in for a recused district attorney"). Therefore, Plaintiff's official capacity claims against McNally and Smith are construed as claims against the State and are thus barred by the Eleventh Amendment. See, e.g., Woodward v. Office of Dist. Atty., 689 F. Supp. 2d 655, 659 (S.D.N.Y. 2010) ("To the extent that [the plaintiff] seeks to assert claims against the District Attorney's Office in federal court, his claims are also barred by the Eleventh Amendment." (citing Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d. Cir. 1993) ) ).

Plaintiff's argument that the Eleventh Amendment does not bar his official capacity claims appears to confuse Eleventh Amendment immunity with prosecutorial immunity. Dkt. No. 43-1 ("McNally Opposition) at 3–5. His claim that "absolute immunity is reserved for officials who perform 'special functions and deserve absolute immunity from civil liabilities,' " id. at 4 (quoting Hill v. City of New York, 45 F.3d 653, 660 (2d Cir. 1995) ), has no bearing on whether state actors are immune from a § 1983 damages claim, see Ying Jing Gan, 996 F.2d at 529 ("The availability of immunity under the Eleventh Amendment does not depend on the nature of the function performed by the state."). The issue of absolute versus qualified immunity concerns prosecutorial, not Eleventh Amendment, immunity, and is addressed below.

**\*7** Because they are barred by the Eleventh Amendment, the official capacity claims against McNally and Smith are dismissed.

#### b. *Prosecutorial Immunity*

McNally and Smith's Eleventh Amendment immunity does not extend to those claims brought against them in their individual capacity. See id. ("To the extent that such a claim is asserted against him in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment."). McNally and Smith argue that they are entitled to prosecutorial immunity against Plaintiff's claims against them in their individual capacity. McNally Mem. at 7–8; Smith Mem. at 20–21.

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

To determine whether a prosecutor enjoys absolute immunity against a claim for damages, courts apply a " 'functional approach,' examining 'the nature of the function performed, not the identity of the actor who performed it.' " Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993) ). "Prosecutors are entitled to absolute immunity when they engage in activities 'intimately associated with the judicial phase of the criminal process,' and done 'in the course of [their] role as ... advocate[s] for the State.' " Kent v. Cardone, 404 F. App'x 540, 542 (2d Cir. 2011) (alterations in original) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976) and Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) ). "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.' " Hill, 45 F.3d at 661 (alteration in original) (quoting Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994) ). Thus, a prosecutor has absolute immunity from claims seeking damages for "initiating a prosecution and ... presenting the State's case," Imbler, 424 U.S. at 431, filing a criminal information and procuring arrest warrants, Barr v. Abrams, 810 F.2d 358, 362 (2d Cir. 1987), negotiating a guilty plea, Taylor v. Kavanagh, 640 F.2d 450, 453 (2d Cir. 1981), or entering "an agreement to forgo prosecution in exchange for certain types of concessions," Kent v. Cardone, 404 F. App'x 540, 542 (2d Cir. 2011). In Hill, the Second Circuit concluded that a prosecutor's alleged acts of "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury" were "clearly protected by the doctrine of absolute immunity as all are part of his function as an advocate." 45 F.3d at 661.

The initiation of a prosecution is an essential element of a malicious prosecution claim, and so prosecutors are generally immune to malicious prosecution claims. See, e.g., Shmueli v. City of New York, 424 F.3d 231, 237 (2d Cir. 2005) ("Because the immunity attaches to the official prosecutorial function and because the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions, the prosecutor has absolute immunity for the initiation and conduct of a prosecution unless [he] proceeds in the clear absence of all jurisdiction." (alteration in original) (internal citations and quotations omitted) ); McKeon v. Daley, 101 F. Supp. 2d 79, 87 (N.D.N.Y. 2000) ("[I]t is well-established in the Second Circuit that claims of malicious prosecution of a particular charge are tied to the judicial phase, and warrant absolute immunity for a defendant district attorney." (collecting cases) ), aff'd, 8 F. App'x 138 (2d Cir. 2001). Plaintiff's allegation that McNally's disqualification

was part of a politically-motivated scheme to scapegoat Plaintiff, Compl. ¶¶ 20–21, does not change the Court's analysis, see Bernard v. Cty. of Suffolk, 356 F.3d 495, 502 (2d Cir. 2004) (concluding that prosecutors' alleged "improper political motive" underlying their "decisions to prosecute plaintiffs and their conduct before the grand jury" was "irrelevant to the applicability of absolute immunity"); see also Peay v. Ajello, 470 F.3d 65, 68 (2d Cir. 2006) ("Plaintiff's claims against [a prosecutor], which encompass activities involving the initiation and pursuit of prosecution [including fabricating evidence and suborning perjury], are foreclosed by absolute prosecutorial immunity, regardless of their alleged illegality.").

**\*8** Absolute immunity for prosecutorial acts is lost where a defendant "proceeds in the clear absence of all jurisdiction." Shmueli v. City of New York, 424 F.3d 231, 237 (2d Cir. 2005) (quoting Barr v. Abrams, 810 F.2d 358, 361 (2d Cir. 1987) ). Plaintiff asserts that Smith lacked jurisdiction to prosecute him because McNally's recusal was "clearly illegal," thus invalidating Smith's appointment as Special Prosecutor. Smith Opp'n at 4–5; Compl. ¶ 20. Smith was appointed on September 28, 2009 by Justice Robert M. Jacon of the New York Supreme Court, Rensselaer County. Dkt. No. 68-3 ("Appointment Order").[5] Plaintiff alleges that McNally's recusal was invalid because it was based on McNally's belief that the potential targets of the investigation "were Democratic operatives who had assisted him in his prior elections and had a very good chance of being implicated in a conspiracy ... which [McNally] either knew or should have known of." Compl. ¶ 20. A district attorney in New York may seek recusal "[w]here there is legitimate doubt as to whether a district attorney and his office may proceed with a case." Working Families Party v. Fisher, 15 N.E.3d 1181, 1185 (N.Y. 2014). Plaintiff's allegation that McNally recused himself from the voter fraud case because he feared he or his political allies would be implicated, Compl. ¶ 20, suggests that recusal was reasonable, not unlawful. In addition, because courts "are not bound to accept as true a legal conclusion couched as a factual allegation," Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555), Plaintiff's claim that the recusal was "clearly illegal" is not enough to plausibly suggest the Appointment Order was invalid.

[5]     Smith submitted the Appointment Order as an exhibit to his Motion. The Court takes judicial notice of the order because it is "integral" to the Complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) ). Moreover, "[c]ourts routinely take judicial notice of documents filed in other courts ... to establish the fact of such litigation and related filings." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (second alteration in original) (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ).

Furthermore, McNally and Smith are entitled to absolute immunity against Plaintiff's conspiracy claim—at least insofar as that claim is brought, in McNally's case, with regard to his pre-recusal behavior—because "it is also well established that absolute prosecutorial immunity extends to conspiracy allegations." Covington v. City of New York, 916 F. Supp. 282, 287 (S.D.N.Y. 1996); see also Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994) (holding that absolute prosecutorial immunity from § 1983 liability extends for "allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial").

That said, McNally's post-recusal actions—which included (1) approaching a witness, id. ¶ 42; (2) meeting and consulting with McInerney, Compl. ¶ 35; (3) referring McInerney to an attorney, id. ¶ 37; and (4) meeting with Smith to discuss the case, id. ¶ 49—are not entitled to absolute immunity and could therefore support a conspiracy claim, if they were undertaken in agreement with Smith to further Plaintiff's alleged malicious prosecution. McDonough v. Smith, No. 15-CV-1505, 2016 WL 5717263, at *21 (N.D.N.Y. Sept. 30, 2016) (citing Kulwicki v. Dawson, 969 F.2d 1454, 1467 (3d Cir. 1992) ), aff'd 898 F.3d 259 (2d Cir. 2018). However, none of those allegations are sufficient, as pled, to give rise to a cognizable claim against McNally and to survive Defendants' motions.

Plaintiff alleges that McNally "in a completely illegal manner, and despite [his] recusal," approached a witness to be called during Plaintiff's second trial. Compl. ¶ 42. However, while Plaintiff claims that McNally's behavior was "illegal, false, fraudulent, and criminal" and made up part of his conspiracy with Smith "to falsely scapegoat prosecute the Plaintiff," id., he neither describes the content of the conversation that occurred between McNally and the witness nor provides any factual support tying that conversation to any alleged conspiracy. Similarly, the fact that McNally "met and consulted with [ ] McInerney about [Plaintiff's] case," id. ¶ 35, and referred McInerney to an attorney, id. ¶ 37, does not show that McNally engaged in a conspiracy with Smith

to maliciously prosecute Plaintiff. Indeed, the Complaint fails to connect those interactions in any way to Smith's prosecution of Plaintiff, and its "conclusory, vague, [and] general allegations" are insufficient to plausibly show that McNally conspired with Smith to "deprive [Plaintiff] of his constitutional rights." Ciambriello, 292 F.3d at 325.

**\*9** Plaintiff's allegations that McNally met with Smith to "discuss[ Plaintiff's] case," Compl. ¶ 49, also fail to state a plausible conspiracy claim. "Mere communications between an individual and a prosecutor, without more concrete allegations of wrongdoing, are insufficient to state a malicious prosecution conspiracy claim." McDonough, 2016 WL 5717263, at *21. Therefore, while McNally's contact with Smith may not have been advisable "given the potential appearance of impropriety," such behavior "does not necessarily indicate a conspiratorial agreement." Id.

As a result, the Court concludes that Smith and McNally are entitled to absolute prosecutorial immunity against Plaintiff's malicious prosecution claims, and that McNally's alleged post-recusal actions do not give rise to a cognizable conspiracy claim. Plaintiff's claims against Smith and McNally in their individual capacities are therefore dismissed in their entirety.

### 2. The Browns

Plaintiff also brings claims for malicious prosecution against the Browns. He alleges that the Browns were "engaged in the political process by assisting the Working Class Party of the City Troy by passing petitions and absentee voting applications relevant to the election of 2009," Compl. ¶ 16, and that they participated in the 2009 voter fraud scheme, id. ¶¶ 18, 20, 23, 25–27. The Complaint also alleges that John Brown was eventually convicted for his role in the scheme. Id. ¶ 45. However, the Complaint does not allege that the Browns initiated or played any role in the criminal investigation and proceedings against Plaintiff, or that they did so with malice. The fact that the Browns allegedly participated in the 2009 voter fraud scheme, id. ¶¶ 20, 23, 25–27, in no way suggests that they initiated the prosecution against Plaintiff.

Moreover, though Plaintiff alleges that the Browns acted under color of state law, Compl. ¶ 3, nothing in the Complaint indicates that the Browns were state actors or held any position in local government or law enforcement, compare id. ¶ 10 (alleging that Smith was the Special District Attorney

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

Case 5:24-cv-01014-BKS-MJK    Document 4    Filed 08/23/24    Page 25 of 63

2018 WL 4565768

for Rensselaer County and acted "in his capacity as an agent, servant, and/or employee of [Rensselaer]"), with id. ¶ 13 (alleging that John Brown "was a resident of the County of Rensselaer and State of New York"), ¶ 14 (alleging that Daniel Brown "was a resident of the County of Rensselaer and State of New York"). [6] Therefore, Plaintiff's § 1983 malicious prosecution claim against the Browns must fail. See, e.g., Krug v. McNally, 488 F. Supp. 2d 198, 199 (N.D.N.Y. 2007) (Kahn, J.) ("It is also well settled that in order for a plaintiff to bring a § 1983 claim against a defendant, that defendant must be a State actor, acting under color of State law.") (citing Rodriguez v. Weprin, 116 F.3d 62, 65 (2d Cir. 1997) ), aff'd, 368 F. App'x 269 (2d Cir. 2010).

[6]     The Browns state that John Brown was a member of the Troy City Council, and Daniel Brown, his brother, served as his campaign manager. Brown Mem. at 3. Because these facts are not alleged in the Complaint, the Court will not consider them in deciding the present motions. See Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) (" '[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion,' a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.' ") (alteration in original) (quoting Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988) ).

 *10  Plaintiff has similarly failed to allege a viable conspiracy claim against the Browns. In opposing the Brown Motion, Plaintiff argues that "there are a myriad of listed facts supporting the allegation of conspiracy," Dkt. No. 45-3 ("Brown Opposition") at 3, but he fails to provide specific citations to that effect. The Complaint does allege that Smith was aware of "a great deal of evidence against" the Browns, id. ¶ 31, that unspecified individuals entered a conspiracy "to hide and cover up" the misconduct of several Democratic operatives, including the Browns, id. ¶ 26, and that John Brown was eventually convicted for his role in the scheme, id. ¶¶ 43, 45. However, these allegations suggest only that Smith disregarded evidence against the Browns and attempted to conceal their wrongdoing; they do not support an inference that there was a conspiracy between the Browns and Smith (or anyone else, for that matter). Plaintiff does not allege that the

Browns discussed the voter fraud investigation with Smith or anyone else, or that they encouraged Plaintiff's prosecution.

The Complaint also states as follows:

> [I]n support of this conspiracy and during the course of this investigation and administration of this case, Defendant Smith, upon information and belief, conspired with the other Defendants once the New York State Police had uncovered overwhelming evidence on their own of the guilt of Defendant McInerney of this forged, false and fraudulent absentee ballot applications and absentee ballots throughout the 2009 election and turn [sic] this overwhelming evidence over to [Rensselaer].

Compl. ¶ 35. Construed in the light most favorable to Plaintiff, that passage seems to indicate that Smith conspired with all of the other named defendants. However, it does not indicate what Smith and "the other Defendants" conspired to do, and does not suggest that they planned to violate Plaintiff's rights. Moreover, Plaintiff's allegation that the "actions and omissions of the Defendants, especially Defendant Smith, ... constituted a conspiracy to make him a scapegoat prosecution target to cover up and prevent the prosecution of the actual liable parties," id. ¶ 36, is too conclusory to support a § 1983 conspiracy claim. See, e.g., Ciambriello, 292 F.3d at 324 ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." (citing Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir. 1992) ) ). In any event, the Browns' actions do not "constitute[ ] a conspiracy," Compl. ¶ 36, because they cannot be classified as overt acts undertaken in furtherance of any agreement.

Therefore, based on the foregoing analysis, the Court will dismiss Plaintiff's malicious prosecution and conspiracy claims as brought against the Browns.

*3. McInerney*

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

Plaintiff also brings claims against McInerney under § 1983 for malicious prosecution and conspiracy. Specifically, Plaintiff alleges that McInerney (1) was "engaged in the political process by assisting the Working Class Party of the City of Troy by passing petitions and absentee voting applications relevant to the election of 2009," Compl. ¶ 16; (2) participated in the 2009 voter fraud scheme, id. ¶¶ 18, 20, 23, 25–27; (3) told "other political party operatives in the [Rensselaer] Democratic Party ... [that, if prosecuted,] he was going to 'take everyone down with him,' " id. ¶ 19; (4) testified at Plaintiff's second trial, id. ¶ 43; and (5) "admitted to guilt for forgeries during the 2009 Working Families Party primary," id. ¶ 44, for which he was sentenced to community service and probation, id. ¶ 45. Plaintiff also alleges that McNally "met and consulted with" McInerney about the voter fraud investigation, id. ¶ 35, "referred" McInerney to an attorney, and "g[ave] him advice" "during the course of [this] consultation," id. ¶¶ 37, 49. Finally, the Complaint states that Smith told McInerney that he "would not be prosecuted despite the overwhelming evidence against [him]." Id. ¶ 49.

**\*11** To the extent Plaintiff bases his claims on McInerney's trial testimony, McInerney enjoys absolute immunity from suit. San Filippo v. U.S. Tr. Co. of N.Y., 737 F.2d 246, 254 (2d Cir. 1984) ("[I]t is settled under Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), that a witness has absolute immunity from § 1983 liability based on the substance of his trial testimony."). A witness's immunity "may not be circumvented by claiming that [the] witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." Rehberg, 566 U.S. at 369. "Were it otherwise, 'a criminal defendant turned civil plaintiff could simply reframe a claim to attack the prosecution instead of the absolutely immune actions themselves.' " Id. (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 283 (1993) (Kennedy, J., concurring in part and dissenting in part) ). In any event, Plaintiff does not allege that McInerney provided false testimony or agreed to do so. His claims appear to be premised on the mere fact that McInerney was guilty of voter fraud and testified against Plaintiff. Even if true, these facts do not support a claim for malicious prosecution or conspiracy.

Furthermore, Plaintiff's allegation that a witness met with a prosecutor is not enough to support a claim of conspiracy. There is "nothing suspicious or improper in" meetings between prosecutors and witnesses. Scotto v. Almenas, 143 F.3d 105, 115 (2d Cir. 1998) (quoting San Filippo, 737 F.2d

at 256). The "mere allegation of their occurrence is [not] sufficient to create a material issue of fact as to whether something improper took place during them." Id. (alteration in original) (quoting San Filippo, 737 F.2d at 256).

Finally, Plaintiff alleges that, as part of the conspiracy, unidentified individuals "utilized ... false, fraudulent and coerced evidence, uncovered through the investigation and administration of this voter fraud case" against him to "hide and cover up the clearly guilty activities of ... Democratic operatives, including [McInerney and the Browns]." Compl. ¶ 23. However, it is unclear what "false, fraudulent and coerced evidence" Plaintiff is referring to or who "utilized" that evidence against him. The Complaint does not allege that McInerney was involved in gathering, fabricating, or presenting any "false" evidence, nor that he was aware that prosecutors utilized improper methods to protect him at Plaintiff's expense. The fact that Smith decided to prosecute Plaintiff instead of McInerney does not suggest that McInerney encouraged or had any role in the prosecution.

Plaintiff's malicious prosecution and conspiracy claims against McInerney are therefore dismissed.

### 4. Ogden

Plaintiff's malicious prosecution and conspiracy claims against Ogden, who at all relevant times worked as an investigator for the New York State Police, Compl. ¶ 15, appear to be based on his role in investigating the voter fraud scheme. While the Complaint makes several references to the "investigating officers behind the prosecution working ... at the behest of [Smith]," Compl. ¶ 27, it does not identify who these officers are or explicitly allege that Ogden investigated Plaintiff. However, because the Court must make all reasonable inferences in Plaintiff's favor in deciding a motion to dismiss, it will assume for the purposes of deciding the Ogden Motion that Ogden was one of the officers involved in the investigation.

To support his malicious prosecution and conspiracy claims, Plaintiff alleges that Ogden "uncovered no evidence of the guilt of [Plaintiff] in any forgery or fraud as to absentee voting applications and ballots, or anything else except clearly phony, baseless and contrived handwriting conclusions, based upon the evidence procured during the investigation and administration of this case." Compl. ¶ 29. The Court construes that language as alleging that the only evidence Ogden

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

Case 5:24-cv-01014-BKS-MJK    Document 4    Filed 08/23/24    Page 27 of 63

2018 WL 4565768

found implicating Plaintiff was obviously fabricated. In addition, Plaintiff alleges in the Complaint that Ogden (1) "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert and uncovered and prepared and provided ... the prosecution false witness testimony statements to try to pin guilt on" Plaintiff, id.; (2) "forged[ ] and falsely created" affidavits "from witnesses who never signed nor read the affidavits ... for the sole purpose of prosecuting [Plaintiff] to cover up the obvious guilt of Democratic operatives, including" McInerney and the Browns, id. ¶ 30; and (3) provided "false, coerced, forged and fictitious evidence to [Smith] ... as part of the conspiracy ... to prosecute" Plaintiff, id. ¶ 39.

**\*12** As Ogden correctly notes, Ogden Mem. at 11, he is entitled to Eleventh Amendment immunity to the extent Plaintiff seeks money damages against him in his official capacity as a New York State Trooper, see, e.g., Kostok v. Thomas, 105 F.3d 65, 69 (2d Cir. 1997) ("Although the Eleventh Amendment does not altogether bar suits against states, the range of available remedies is narrow. Any claim for retroactive monetary relief, under any name, is barred." (collecting cases) ). Because Plaintiff seeks only compensatory damages and has not requested declaratory or injunctive relief, his official capacity claims against Ogden are therefore barred by the Eleventh Amendment.

To the extent that Plaintiff brings a malicious prosecution claim against Ogden in his individual capacity, Ogden argues that such a claim should be dismissed because, "[w]hile [Plaintiff] alleges that the 'Defendants prosecuted [him] maliciously,' nothing is offered to explain how Trooper Ogden was involved" in the prosecution. Ogden Mem. at 7. Ogden describes Plaintiff's allegations regarding the falsification of evidence as "[b]ald assertions devoid of any factual particularity," because the Complaint includes no "factual allegations as to what" Ogden "supposedly falsified." Id.

Plaintiff did not respond to Ogden's argument or contend that the Complaint alleges with sufficient particularity what evidence Ogden allegedly fabricated. See Dkt. No. 59-1 ("Ogden Opposition") at 11–12 (discussing Plaintiff's malicious prosecution claim). Instead, Plaintiff simply recites the standard for alleging a malicious prosecution claim several times, then argues that he has stated a claim because the Complaint alleges that "Ogden did not take any steps to discontinue the prosecution after learning that there was

absolutely no probable cause that existed, which he clearly had a duty, at least in part, to do." Id. at 12.

The Court agrees with Ogden that Plaintiff has failed to state a claim for malicious prosecution against him. A police officer "initiates" a prosecution when he swears to and signs a criminal complaint. Burt v. Aleman, No. 05-CV-4493, 2008 WL 1927371, at *5 (E.D.N.Y. Apr. 30, 2008) (citing Cox v. Cty. of Suffolk, 827 F. Supp. 935, 938 (E.D.N.Y. 1993) ). The Complaint alleges that Ogden fabricated evidence against Plaintiff and lacked probable cause to prosecute him, but it does not allege that he signed a criminal complaint or otherwise initiated the prosecution. On the contrary, Plaintiff alleges that Smith initiated the prosecution. Compl. ¶¶ 24, 49. "Once control of a prosecution has passed to a prosecuting attorney, a police officer may only be liable for 'continuing' the prosecution if he or she '[insists] upon or [urges] further prosecution.' " Burt, 2008 WL 1927371, at *5 (alterations in original) (quoting Dirienzo v. United States, 690 F. Supp. 1149, 1158 (D. Conn. 1988) ). Plaintiff makes no such allegation, and the Complaint makes clear that Smith, not Ogden, controlled the investigation and prosecution. E.g., Compl. ¶¶ 24–36, 49. Therefore, because he has failed to allege that Ogden initiated or continued the prosecution against him, Plaintiff's malicious prosecution claim fails.

Ogden argues that the conspiracy claim should also be dismissed, because the Complaint contains "no allegation that [he] entered into any agreement with the named Defendants and against [Plaintiff's] purported interests." Ogden Mem. at 5. He further argues that Plaintiff's "bald assertion that affidavits were forged or falsified during the criminal investigation" is too vague and general because Plaintiff fails "to provide some factual allegations as to what was supposedly falsified by" Ogden. Id. at 7. In response, Plaintiff contends that he "can sufficiently establish a claim for conspiracy by setting forth ten separate interactions between defendants Smith, McInerney, McNally, J. Brown, and D. Brown, especially if and when Trooper Ogden is himself involved." Ogden Opp'n at 10. He also claims that he "does not need to address specific factual allegations as to the manner in which Trooper Ogden was involved as long as it can be established that he may have been circumstantially involved." Id.

**\*13** As already noted above, at the motion to dismiss stage, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Ciambriello, 292 F.3d at 325 (quoting Dwares, 985 F.2d at 100). A plaintiff must "make an effort to provide some details of time and place and the alleged effect of the conspiracy." Dwares, 985 F.2d at 100 (quotation omitted). He meets this burden by alleging "facts upon which it may be plausibly inferred that the defendants came to an agreement to violate his constitutional rights." Green v. McLaughlin, 480 F. App'x 44, 46 (2d Cir. 2012) (citing Iqbal, 556 U.S. at 680–81). While "[a] plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, [ ] the pleadings must present facts tending to show agreement and concerted action." Dunlop v. City of New York, No. 06-CV-433, 2008 WL 1970002, at *4 (S.D.N.Y. May 6, 2008) (alterations in original) (quoting McIntyre v. Longwood Cent. Sch. Dist., No. 07-CV-1337, 2008 WL 850263, at *11 (E.D.N.Y. Mar. 27, 2008) ).

Plaintiff has failed to meet this standard with respect to Ogden. The Complaint contains few specific factual allegations regarding Ogden's conduct, and largely "mashes together vague allegations, not parsed out as to each defendant, in the hopes that it will give rise to a conspiracy claim; it does not." Sanchez v. Hoosac Bank, No. 12-CV-8455, 2014 WL 1326031, at *7 (S.D.N.Y. Mar. 31, 2014). While a "general allegation of conspiracy" can state a plausible claim if "amplified by specific instances of conduct," Hernandez, 312 F. Supp. 2d at 546, Plaintiff's allegations contain no such amplification. He alleges that Ogden "uncovered ... clearly phony, baseless and contrived handwriting conclusions," Compl. ¶ 29, "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert and uncovered and prepared and provided t [sic] the prosecution false witness testimony statements," id., and "forged, and falsely created" affidavits "from witnesses who never signed nor read the affidavits ... for the sole purpose of prosecuting [Plaintiff] to cover up the obvious guilt of [other] Democratic operatives," id. ¶ 39. These allegations do not specify what the false "handwriting conclusions" were, why they were "phony," what was untrue about the handwriting expert's statements, who provided false testimony (and what made it false), what forged affidavits were presented, who the affidavits were purportedly from, or what facts were misstated. Nor can the Complaint's deficiencies be blamed on a lack of knowledge on Plaintiff's part. Given that the allegedly falsified evidence would have been submitted at one of Plaintiff's two criminal trials—or, at

the very least, disclosed to Plaintiff's attorney—the Court can assume that Plaintiff had access to it.

As a result, because Plaintiff has failed to specifically plead that Ogden entered an agreement to violate Plaintiff's rights or to describe any specific instances of misconduct sufficient to support an inference of agreement, Plaintiff's conspiracy claim against Ogden is dismissed. See, Dunlop, 2008 WL 1970002, at *3–7 (dismissing a conspiracy claim premised on the defendants' alleged agreement to " ' alter, fabricate, and manufacture' false evidence to be used against the plaintiff" because the allegations lacked "sufficient factual details" to state a plausible claim of conspiracy); Brown v. Seniuk, No. 01-CV-1248, 2002 WL 32096576, at *4 (E.D.N.Y. Mar. 25, 2002) (holding that allegations that a prosecutor and police officer conspired "to obtain a conviction at any cost" by "making false statements and falsifying reports, presenting false evidence, giving hearsay testimony" was conclusory and "lack[ed] specific facts that show an agreement among the alleged co-conspirators or that the [i]ndividual [d]efendants acted with a shared purpose or common design").

### B. Negligent Investigation Claim

**\*14** Plaintiff's second claim appears to be for negligent investigation. Compl. ¶ 57. In support of this claim, he alleges that "Defendants maliciously, intentionally and willfully failed to properly, appropriately and sufficiently examine the evidence and investigate the facts which they alleged to have supported [his] indictment and prosecution." Id. ¶ 58. Ogden argues that this claim should be dismissed because negligent investigation "is not a recognized cause of action." Ogden Mem. at 6 (citing Pawlicki v. City of Ithaca, 993 F. Supp. 140, 143 (N.D.N.Y. 1998) ). Plaintiff concedes "that a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate care in effecting an arrest," but contends that "those negligence claims can survive if couched in terms of malicious prosecution and false imprisonment, which the claims asserted in [the] [C]omplaint are." Ogden Opp'n at 10.

First, the Court is unaware of any court recognizing a § 1983 negligent investigation claim, and therefore agrees with Ogden that such a claim does not exist. See Pawlicki, 993 F. Supp. at 143 ("Where the negligence alleged is based upon an arrest, a plaintiff must resort to the traditional remedies of false imprisonment and malicious prosecution and cannot recover under the broader principles of negligence.").

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 29 of 63

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

As to the arguments raised by Plaintiff in his Ogden Opposition, the Court finds that framing Plaintiff's negligence claim as a malicious prosecution claim would make it duplicative of Plaintiff's third cause of action. Repackaging it as a false imprisonment claim, on the other hand, is not warranted based on the facts alleged in the Complaint and, in any event, would work undue prejudice on Defendants. No defendant has interpreted the Complaint to include a false arrest claim, and the Court agrees that Plaintiff has not pled a claim for false arrest. See also Suppl. Opp'n at 2 (noting that Defendants "have been able to identify each of the claims set forth by [Plaintiff], reflecting fair notice of the allegations the Complaint asserts"). Plaintiff's negligent investigation claims are therefore dismissed.

### C. Abuse of Process Claim

Plaintiff's third claim is for malicious abuse of process in violation of the Fourteenth Amendment. Compl. ¶¶ 63–69. "[A]buse of criminal process is actionable under § 1983 as a denial of procedural due process." Sullivan v. LaPlante, No. 03-CV-359, 2005 WL 1972555, at *3 (N.D.N.Y. Aug. 16, 2005) (citing Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994) ). The Court "turn[s] to state law to find the elements of the malicious abuse of process claim." Cook, 41 F.3d at 80. "In New York, 'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.' " Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (quoting Cook, 41 F.3d at 80).

The third element of an abuse of process claim—alleging a "collateral objective"—is where many pleadings fall short. The New York Court of Appeals has explained that "[a] malicious motive alone ... does not give rise to a cause of action for abuse of process." Curiano v. Suozzi, 469 N.E.2d 1324, 1326–27 (N.Y. 1984). "Accordingly, to state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino, 331 F.3d at 77.

In Board of Education of Farmingdale Union Free School District v. Farmingdale Classroom Teachers Association, Inc., Local 1889 AFT AFL-CIO, 343 N.E.2d 278 (N.Y. 1975), the New York Court of Appeals discussed the characteristics

of collateral objectives that will support an abuse of process claim. Id. at 283–84. It explained that "[w]here process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party." Id. at 283. "Typical scenarios in which courts in this circuit have sustained a claim of malicious abuse of process involve prosecutions for reasons wholly outside of the initial prosecution." Hoffman v. Town of Southampton, 893 F. Supp. 2d 438, 448 (E.D.N.Y. 2012), aff'd, 523 F. App'x 770 (2d Cir. 2013); see also Richardson v. N.Y.C. Health and Hosps. Corp., No. 05-CV-6278, 2009 WL 804096, at *16 (S.D.N.Y. Mar. 25, 2009) ("[T]he collateral objectives typically associated with abuse of criminal process are extortion, blackmail or retribution; and those objectives are usually characterized by personal animus." (alteration in original) (quoting Jovanovic v. City of New York, No. 04-CV-8437, 2006 WL 2411541, at *12 n.4 (S.D.N.Y. Aug. 17, 2006) ) ).

**\*15** Likewise, in Del Col v. Rice, No. 11-CV-5138, 2012 WL 6589839 (E.D.N.Y. Dec. 18, 2012), the plaintiffs properly pled a claim for abuse of process by alleging that the defendants had "started the legal process not only to have [the p]laintiffs wrongfully arrested, which is an improper motive, but also to gain control of [one plaintiff's] claim to [a disputed] patent without properly compensating [him], which is an improper collateral purpose." Id. at *10. The subtle motive-purpose distinction referred to by the Del Col court forms a fundamental pillar of the caselaw in this area. It is widely accepted that "[i]mproper motives in using [a] process do not, without more, constitute a collateral objective, provided the process itself is used for its legitimate purpose.... Abuse, therefore, lies not in the synthesis of proper purpose and suspect motive. Improper motive is only abuse when joined with improper purpose." Chamberlain v. Lishansky, 970 F. Supp. 118, 122 (N.D.N.Y. 1997) (citation omitted); see also Knox v. Cty. of Ulster, No. 11-CV-112, 2013 WL 286282, at *5 (N.D.N.Y. Jan. 24, 2013) ("Where a defendant's objective in initiating an arrest is to prevail on a criminal prosecution, the plaintiff will not prevail on a claim for abuse of process."); Hoffman, 893 F. Supp. 2d at 448 (dismissing an abuse of process claim because the plaintiffs "failed to allege that defendants had a collateral purpose beyond pursuing, and prevailing in, [the] plaintiffs' criminal prosecution"). Thus, the Del Col defendants possessed a collateral objective in violation of the Fourteenth Amendment because the *purpose* of the indictment and arrest they implemented "was to

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 30 of 63

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

invalidate [the plaintiff's] claim to the patent." Del Col, 2012 WL 6589838, at *10.

Plaintiff alleges that he was criminally prosecuted "for the intentional purpose of covering up the criminal liability" of others, including McInerney, the Browns, "and other Democratic operatives." Compl. ¶¶ 64–65. He argues that this allegation satisfies the collateral objective requirement. Smith Opp'n at 9. However, courts in this Circuit have concluded that allegations that defendants pursued a prosecution in order to "cover up" their own misconduct or protect other bad actors does not satisfy the collateral objective requirement. E.g., Gilliard v. City of New York, No. 10-CV-5187, 2013 WL 521529, at *14 (E.D.N.Y. Feb. 11, 2013) ("At most, Defendants issued the summons with the improver *motive* of 'cover[ing] up their abuse of authority in arresting plaintiff.' " (alteration in original) ); Crews v. Cty. of Nassau, No. 06-CV-2610, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007) ("Because plaintiffs have merely alleged that defendants were motivated by their desire to cover up their misdeeds, but not that defendants had a purpose other than to prosecute Crews, the abuse of process claim fails."); see also Cabisca v. City of Rochester, No. 14-CV-6485, 2017 WL 4221090, at *6 (W.D.N.Y. Sept. 21, 2017) (rejecting abuse of process claim premised on the allegation that the defendants commenced a prosecution "to provide some lame excuse for committing their outrageous actions ... [that] they could not defend in any manner without concocting an offense and crime with which to charge the plaintiff"). As the Second Circuit has explained, " 'the falsity of the allegations and defendant's malicious motive in making them do not, of themselves, give rise to a cause of action for abuse of process' where 'the process was both issued and used for its intended purpose.' " Silver v. Kuehbeck, 217 F. App'x 18, 21 (2d Cir. 2007) (quoting Butler v. Ratner, 619 N.Y.S.2d 871, 873 (App. Div. 1994) ).

In light of these cases, the Court concludes that Plaintiff has alleged that Defendants acted with an improper motive in prosecuting him, but he has not pled that they had an improper purpose. Therefore, his § 1983 abuse of process claim fails and is subject to dismissal.

### D. Stigma-Plus Defamation Claim
Plaintiff's fourth claim is for defamation in violation of the Fourteenth Amendment. Compl. ¶¶ 70–78. The Fourteenth Amendment's Due Process Clause prohibits a state actor from depriving a citizen of her life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. It is well settled

that "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause to create a cause of action under § 1983." Patterson v. City of Utica, 370 F.3d 322, 329–30 (2d Cir. 2004) (citing Paul v. Davis, 424 U.S. 693, 701 (1976) ). "Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." Id. at 330 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 572–73 (1972) ). Such an action is generally referred to as a "stigma-plus" claim, and involves "injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003) (citing Paul v. Davis, 424 U.S. 693, 701–02, 711–12 (1976) ).

**\*16** Plaintiff alleges that Defendants defamed him by subjecting him to a baseless prosecution, causing his "reputation in the community [to be] destroyed and permanently harmed." Compl. ¶ 73. As a result of Defendants' defamatory statements, Plaintiff's business, "a very successful restaurant in Troy, lost hundreds of thousands of dollars in profits, and is currently under great risk of failure." Id. ¶ 74. However, the Complaint does not allege what the defamatory statements were or who made them, nor does it point to any deprivation of a tangible (i.e., non-speculative) right or property interest.

The Second Circuit has held that " 'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004) (alteration in original) (quoting Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994) ). The plaintiffs in Sadallah alleged that the defendants' acts caused "damage not only to their business reputation, but [also the deprivation] of the good will in their business" and "served to discourage customers from availing themselves of the [p]laintiffs' facility." Id. at 38–39 (first alteration in original). The court concluded that allegations of lost income and business reputation did not amount to "the additional state-imposed burden necessary for invoking the 'stigma plus' doctrine." Id. at 38. Such harms, the court explained, "are not 'in addition to' the alleged defamation, but rather are direct 'deleterious effects' of that defamation." Id. (citations omitted).

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 31 of 63
LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)
2018 WL 4565768

Like the plaintiff in Sadallah, Plaintiff's stigma-plus claim fails because he has failed to allege a deprivation of tangible liberty interest or property right tied to Defendants' alleged defamatory statements. He is correct that "[a]ll ... [he] need show here [to survive dismissal] is some allegation of credible evidence of deprivation of a liberty interest and defamation." Smith Opp'n at 10. But Plaintiff's allegation that his business suffered lost profits as a result of Defendants' acts and statements, Compl. ¶¶ 72–74, "does not satisfy the separate and independent 'plus' prong of the 'stigma plus' test," Sadallah, 383 F.3d at 39. Therefore, his § 1983 defamation claim fails and is dismissed.

### E. Obstruction of Criminal Investigation Claim

Plaintiff's fifth claim, that Defendants violated 18 U.S.C. § 1510 by "intentionally obstructing a criminal investigation to scapegoat prosecute [sic] the Plaintiff and to cover up the criminal activities of the Defendants[] and others," Compl. ¶ 80, suffers from several deficiencies.

First, § 1510 only proscribes interference with *federal* criminal investigations. See § 1510 (imposing criminal liability for "[w]hoever willfully endeavors by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States"); see also United States v. Abrams, 543 F. Supp. 1184, 1187 (S.D.N.Y. 1982) ("To prove a violation of 18 U.S.C. § 1510, the government must prove beyond a reasonable doubt that [ ] the defendant wilfully endeavored by one of the means set forth in the statute to prevent the communication of information *relating to a violation of the federal criminal laws.*" (emphasis added) (citing United States v. San Martin, 515 F.2d 317, 320 (5th Cir. 1975) ) ). Because Plaintiff alleges that Defendants obstructed a state investigation, they could not possibly have violated § 1510.

Second, there is no indication that § 1510 creates an individual right that can be enforced through § 1983. The Supreme Court has "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002). To determine whether a statutory violation can be enforced through § 1983, a court "must first determine whether Congress *intended to create a federal right.*" Id. " '[T]he question whether Congress ... intended to create a private right of action [is] definitively answered in the negative' where a 'statute by its terms grants no private rights to any identifiable class.' " Id. at 283–84 (second and third alterations in original) (quoting Touche Ross & Co. v.

Redington, 442 U.S. 560, 576 (1979) ). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.' " Id. at 284 (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 692, n.13 (1979) ).

**\*17** The Court concludes that § 1510 confers no individual rights that may be enforced through § 1983. Section 1510 "was designed to deter the coercion of potential witnesses by the subjects of federal criminal investigations prior to the initiation of judicial proceedings." United States v. San Martin, 515 F.2d 317, 320 (5th Cir 1975) (quoting United States v. Cameron, 460 F.2d 1394, 1401 (5th Cir. 1972) ). Even if the provision created a federal right for witnesses and government informants to be protected from coercion by targets of federal investigations, there is no indication that § 1510 creates any rights for the targets themselves. Moreover, criminal provisions generally do not create private rights. See, e.g., Weinstein v. City of New York, No. 13-CV-6301, 2014 WL 1378129, at *4 (S.D.N.Y. Apr. 8, 2014) ("[T]he Title 18 violations referenced in the Complaint are not actionable. Violations of the Criminal Code do not provide a basis for a civil cause of action, unless the particular provision in question includes an express or implied private right of action." (citing Cort v. Ash, 422 U.S. 66, 79–80 (1975) ) ), aff'd, 622 F. App'x 45 (2d Cir. 2015); Bender v. City of New York, No. 09-CV-3286, 2011 WL 4344203, at *2 (S.D.N.Y. Sept. 14, 2011) (concluding that 18 U.S.C. § 1512 and other federal criminal provisions did not create any private right of action). Plaintiff makes no effort to challenge this conclusion and has not identified any caselaw in support of his contention that he may bring a § 1983 action premised on an alleged § 1510 violation.

Therefore, for the reasons set forth above, Plaintiff's cause of action for obstruction of criminal investigation fails to state a claim and is dismissed.

### F. RICO Claims

Plaintiff's sixth claim is for RICO violations and RICO conspiracy. Compl. ¶¶ 88–100. [7] "[T]o establish a violation of [RICO], a plaintiff must establish that a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001). " 'Racketeering activity' is broadly defined to encompass a variety of state and federal offenses including,

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 32 of 63

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

inter alia, murder, kidnapping, gambling, arson, robbery, bribery and extortion." Id. (citing § 1961(1) ).

[7]    Plaintiff does not oppose the Rensselaer Motion insofar as it seeks dismissal of his RICO claims against the Rensselaer County, Dkt. No. 97-1 ("Rensselaer Opposition") at 1. Therefore, the Rensselaer Motion is granted with respect to those claims.

The Complaint purports to allege several predicate acts of racketeering, including the "criminal investigation le[a]ding to prosecution of [Plaintiff]'s federal and civil rights, obstruction of justice, ... fabrication of false testimony, ... fabricating and presenting false evidence and judicial proceedings against [Plaintiff]," and otherwise "aiding the Defendants to avoid prosecution and scapegoat" Plaintiff. Compl. ¶ 90. These allegations generally target the same underlying conduct: Defendants' purported conspiracy to target and criminally prosecute Plaintiff.

As a general matter, "[c]ivil rights violations and injury to reputation do not fall within the statutory definition of 'racketeering activity.' " Bowen v. Oistead, 125 F.3d 800, 806 (9th Cir. 1997) (dismissing RICO claims where the plaintiff alleged a "criminal conspiracy to deprive [him] of his civil rights and to injure his reputation and standing in the community"). Courts have consistently rejected attempts to repackage claims premised on malicious prosecution and fabrication of evidence as RICO claims. See, e.g., Hall v. Tressic, 381 F. Supp. 2d 101, 111 (N.D.N.Y. 2005) ("Malicious prosecution is not considered a predicate act for RICO purposes."); Gee Chan Choi v. Jeong-Wha Kim, No. 04-CV-4693, 2006 WL 3535931, at *9 (E.D.N.Y. Dec. 7, 2006) (dismissing RICO claim because "the indictment and trial were the result of the alleged malicious prosecution by defendants, which is clearly non-RICO conduct"); see also Gamboa v. Velez, 457 F.3d 703, 710 (7th Cir. 2006) ("RICO demands more than a straightforward case of malicious prosecution (such as the case before us) to open up its window to treble damages."); Streck v. Peters, 855 F. Supp. 1156, 1162 (D. Haw. 1994) (concluding that perjury in federal court may qualify as a RICO predicate act, but perjury in state court does not). Therefore, Plaintiff's allegations that Defendants illegally targeted him for criminal prosecution and frustrated the administration of justice to protect their political allies does not amount to racketeering activity under § 1961.

**\*18** Plaintiff's argument that Defendants engaged in "predicate acts of fraud," Brown Opp'n at 6; McNally Opp'n at

7–8, does not save his RICO claim. He asserts that Defendants "fraudulently attempted to avoid their [own] prosecution for obvious multiple criminal acts and allowed the acts to be placed at the feet of [Plaintiff] who was their scapegoat prosecution target for their own gain." Brown Opp'n at 6; McNally Opp'n at 8. However, "fraudulent prosecution" is not the sort of "fraud" targeted by RICO, and does not constitute "racketeering activity" as defined by § 1961. See § 1961(1) (defining "racketeering activity" to include certain state law crimes and enumerated federal offenses). [8]

[8]    Plaintiff did allege the violation of one predicate statutory provision listed in § 1961(1), obstruction of a federal criminal investigation under § 1510. Compl. ¶¶ 83–87. However, as explained above, because he has failed to allege any interference with a *federal* investigation, his § 1510 claim fails and cannot support a RICO claim.

As a result, Plaintiff's RICO claim fails and is dismissed. [9] And, because Plaintiff has failed to allege a viable RICO claim, his RICO conspiracy claim must also be dismissed. See Citadel Mgmt., Inc. v. Telesis Tr., Inc., 123 F. Supp. 2d 133, 156 (S.D.N.Y. 2000) ("[A] RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met." (citing Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1062–63 (2d Cir. 1996) ) ).

[9]    The Court notes that Plaintiff has failed to comply with Local Rule 9.2, which requires a party asserting a RICO claim to submit a civil RICO statement within thirty days of filing the pleading asserting the claim. L.R. 9.2. However, because his RICO claims are dismissed for failure to state a claim, the Court need not address the Browns' argument that his failure to comply with Rule 9.2 justifies dismissal. Dkt. No. 51 ("Brown Reply") at 9–10.

### G. Claims Against Rensselaer

#### 1. *Monell* Claim

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691. To establish municipal liability under § 1983, a plaintiff must plead and prove that

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

the deprivation of his constitutional rights was "caused by a governmental custom, policy, or usage of the municipality." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012) (citing Monell, 436 U.S. at 690–91). First, a plaintiff may establish the existence of a municipal policy or custom by showing

> (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates.

McLennan v. City of New York, 171 F. Supp. 3d 69, 94 (S.D.N.Y. 2016). Thus, a plaintiff " 'need not identify an express rule or regulation,' but can show that 'a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.' " Littlejohn v. City of New York, 795 F.3d 297, 314–15 (2d Cir. 2015) (quoting Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) ). "Second, the plaintiff must establish a causal connection—an 'affirmative link'— between the policy and the deprivation of his constitutional rights." Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985).

**\*19** "Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.' " McLennon, 171 F. Supp. 3d at 94 (quoting Green v. City of Mount Vernon, 96 F. Supp. 3d 263, 301–02 (S.D.N.Y. 2015) ). "To survive a motion to dismiss a municipal liability claim, 'a plaintiff must allege facts tending to support, at least circumstantially, an inference that ... a municipal policy or custom exists.' " Id. at

95 (quoting Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) ).

Plaintiff raises four arguments in support of his Monell claims. First, he contends that he has adequately alleged the existence of a municipal policy because McNally and Smith's conduct in investigating and prosecuting Plaintiff and non-party Edward McDonough for voter fraud "reflects a pattern of unlawful practices of systemic and ongoing unconstitutional violations." Rensselaer Opp'n 4 6. However, the fact that Plaintiff can only point to two allegedly unlawful prosecutions—his own and McDonough's, id. at 5–6— undermines his claims of widespread, systemic wrongdoing and fails to support an inference that Rensselaer had a policy or practice of wrongfully prosecuting criminal defendants. See, e.g., Jones, 691 F.3d at 85 (concluding that evidence of two or three instances in which police officers "abused the rights of black people" fell "far short of showing a policy, custom, or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities"); Giaccio v. City of New York, 308 F. App'x 470, 472 (2d Cir. 2009) (stating that the plaintiff "identifie[d], at most, only four examples where the defendants might have disclosed positive drug test results," and holding such "evidence [fell] far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability" (citations and internal quotation marks omitted) ); McLennon, 171 F. Supp. 3d at 96 (concluding that six allegations of unlawful searches and seizures was not "so widespread as to constitute a municipal custom"); Tieman v. City of Newburgh, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (concluding that thirteen instances of similar excessive force allegations over a four year period failed to plausibly allege a widespread practice).

Second, Plaintiff argues that, as municipal policymakers, McNally's and Smith's actions while investigating and prosecuting Plaintiff constitute municipal policy and "reflect[ ] a pattern of unlawful practices of systemic and ongoing unconstitutional violations." Rensselaer Opp'n at 6; Compl. ¶¶ 38, 85. However, as explained earlier, "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988), cert. denied, 488 U.S. 1014 (1989). Thus, "a district attorney's misconduct in prosecuting an individual could not

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

give rise to municipal liability." Walker v. City of New York, 974 F.2d 293, 301 (2d Cir. 1992) (citing Baez, 853 F.2d at 77).

That said, "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." Id. Plaintiff argues that Smith was a county policymaker because he "had authority to supervise the investigation of [Plaintiff] and direct the conduct of other defendants." Rensselaer Opp'n at 6. He also states somewhat vaguely that "Smith's conduct went beyond 'typical prosecutor activities like negotiating pleas, scheduling hearings, and filing affirmation in support of writs.' " Id. (citing Peterson v. Tomaselli, 469 F. Supp. 146 (S.D.N.Y. 2007) ). But a prosecutor only acts as a "manager" for the purpose of Monell liability when (s)he performs administrative acts "such as 'workplace hiring, payroll administration, the maintenance of physical facilities, and the like.' " Jones v. City of New York, 988 F. Supp. 2d 305, 316–17 (E.D.N.Y. 2013) (quoting Van de Kamp v. Goldstein, 555 U.S. 335, 344 (2009) ). Contrary to Plaintiff's contention, Rensselaer Opp'n at 6, a district attorney is not a "manager" for purposes of municipal liability simply because he supervises an investigation or oversees the acts of others involved in a prosecution. See, e.g., Jones, 988 F. Supp. 2d at 317 (noting that "[t]asks directly connected with the prosecutor's basic trial advocacy and prosecutorial duties— including Brady decisions—should under Van de Kamp be treated as 'prosecutorial conduct' " and concluding that "the training of ADAs in the proper disclosure of exculpatory DNA evidence [because it] is inextricably connected with prosecution of criminal cases"); see also Van de Kamp, 555 U.S. at 344 (explaining that "prosecutorial conduct" includes those tasks that "require legal knowledge and the exercise of related discretion"). At its core, the Complaint challenges the way in which McNally and Smith prosecuted Plaintiff and chose not to prosecute other individuals he claims were involved in the voter fraud scheme. Because this is prosecutorial conduct, McNally and Smith were not acting as county policymakers, and Rensselaer is not liable for their actions.

**\*20** Third, Plaintiff makes numerous references in the Complaint to Rensselaer's "policy of action and omission," id. ¶ 38, and "long standing unofficial policy of malfeasance," id. ¶ 85, which allegedly resulted in the criminal prosecution of innocent parties. "However, 'policy' is not a magic word. Simply saying it does not make it so." Zherka v. City of New York, N.Y., No. 08-CV-9005, 2010 WL 4537072, at \*3 (S.D.N.Y. Nov. 9, 2010), aff'd, 459 F. App'x 10 (2d Cir.

2012). And the Complaint does not contain "sufficient factual matter" to plausibly suggest that Rensselaer had a policy of violating criminal defendants' rights, whether by fabricating evidence, covering up misconduct, or prosecuting individuals it knew to be innocent. Iqbal, 556 U.S. at 677; see also Zherka, 2010 WL 4537072, at \*3 (dismissing claims for municipal liability because the complaint—which stated that the defendant city had "ethnically profil[ed]" the plaintiff and "opened a phony investigative file on [him]"—"fail[ed] to proffer any factual support that would allow the Court to deem the allegations conceivable, let alone plausible").

Though not clearly articulated, a liberal reading of the Complaint suggests that Plaintiff may also be seeking to establish a municipal liability claim under a fourth theory —on the basis that Rensselaer failed to adequately train its prosecutors. See Compl. ¶ 85 (alleging that Rensselaer's acts "amounted to establishing, promoting and allowing a long standing unofficial policy of malfeasance by the Defendant County officials in, among other things, failing to ... instruct and regulate against it"). As noted above, failure to train or supervise municipal agents can support a claim for municipal liability. E.g., McLennon, 171 F. Supp. 3d at 94. But "where ... [a municipality] has a training program, a plaintiff must ... 'identify a specific deficiency in the ... training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation.' " Wray, 490 F.3d at 196 (quoting Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004) ). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." Okin v. Vill. of Cornwall–On–Hudson Police Dep't, 577 F.3d 415, 440–41 (2d Cir. 2009) (quoting Canton, 489 U.S. at 390–91).

The Complaint does not satisfy this standard. In it, Plaintiff does not state whether Rensselaer provides any training program to its prosecutors, and, if it does, how that training was inadequate and "closely related to [his] injury, such that it actually caused the constitutional deprivation." Wray, 490 F.3d at 196 (quotation marks omitted). He alleges only that McNally and Smith violated his rights and, therefore, Rensselaer must have failed to offer proper instruction to prevent the violation. Such an allegation cannot support municipal liability under § 1983; to hold otherwise would be to effectively impose respondeat superior liability on

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

Case 5:24-cv-01014-BKS-MJK    Document 4    Filed 08/23/24    Page 35 of 63

2018 WL 4565768

municipalities in direct contravention of the guidance offered in Monell.

Accordingly, Plaintiff's Monell claims against Rensselaer will be dismissed in their entirety.

### 2. Remaining Claims Against Rensselaer

Plaintiff also alleges that Rensselaer "had direct and vicarious liability for ... [the] actions and omissions of all of the other Defendants." Compl. ¶ 9; see also id. ¶ 22 ("Throughout these activities of commission and omission, Defendants Smith and McNally acted in the scope of his [sic] employment as an employee of, and District Attorney of the Defendant County who, as a matter of law, was directly and vicariously liable for his [sic] actions of commission and omission."). However, it is well-established that "vicarious liability is inapplicable to ... [section] 1983 suits." De Ratafia v. Cty. of Columbia, No. 13-CV-174, 2013 WL 5423871, at *8 (N.D.N.Y. Sept. 26, 2013) (alterations in original) (quoting Iqbal, 556 U.S. at 676). Therefore, to the extent Plaintiff seeks to hold Rensselaer vicariously liable for the conduct of its municipal officials, his claims are not cognizable under § 1983 and must be dismissed.

### H. Sanctions Motion

**\*21**  The Browns have also moved for sanctions against Plaintiff and his former attorney, Dwyer, pursuant to Rule 11(c) of the Federal Rules of Civil Procedure. Sanctions Mot.

Pursuant to Rule 11(b), when an attorney or unrepresented party submits papers to a court, (s)he "certifies that to the best of [his/her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" (1) the submission "is not being presented for any improper purpose," such as harassment or "unnecessary delay," (2) "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and (3) the factual contentions "have evidentiary support or, ... will likely have evidentiary support after a reasonable opportunity" for discovery. If a "court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable

conduct by others similarly situated," and "may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). However, a court may not impose monetary sanctions "against a represented party for violating Rule 11(b)(2)," which concerns the legal claims and defenses asserted. Fed. R. Civ. P. 11(c)(5)(A).

Rule 11 "is targeted at situations 'where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.' " Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993) (quoting Associated Indem. Corp. v. Fairchild Indus., 961 F.2d 32, 34 (2d Cir. 1992) ). "When divining the point at which an argument turns from merely losing to losing and sanctionable," the Second Circuit has "instructed district courts to resolve all doubts in favor of the signer." Id. (quoting Associated Indem., 961 F.2d at 34–35). "Even if the district court concludes that the assertion of a given claim violates Rule 11, however, the decision whether or not to impose sanctions is a matter for the court's discretion." Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004).

The Browns argue that sanctions are warranted here because Plaintiff's "[c]ounsel failed to conduct a reasonable inquiry into the validity of the legal claims asserted against Defendants, and their likelihood of success, as well as to the underlying factual and legal contentions upon which [Plaintiff's] claims were based." Sanctions Mem. at 1. They describe the Complaint as "a classic example of frivolous litigation sanctionable under Rule 11." Id. at 12. However, while the Browns seek sanctions against both Plaintiff and Dwyer, their arguments focus exclusively on the attorney's conduct. See id. ("Plaintiff's Counsel breached his Rule 11 obligations by failing to conduct a reasonable inquiry into the facts to support the allegations asserted in the Complaint."); id. at 13 ("Plaintiff's Counsel breached his Rule 11 obligations by failing to conduct a reasonable inquiry into the law to support the claims asserted in the Complaint."). Because the Browns have not identified any acts by Plaintiff that they believe are sanctionable, it would be improper to award sanctions against him.

**\*22**  As to the sanctions requested against Dwyer, the Court finds that, though the Complaint fails to allege sufficient facts

**Case 5:24-cv-01014-BKS-MJK    Document 4    Filed 08/23/24    Page 36 of 63**

LoPorto v. County of Rensselaer, Not Reported in Fed. Supp. (2018)

2018 WL 4565768

to state a claim against the Browns and several of Plaintiff's claims are not legally cognizable, sanctions are not warranted in this case. In light of the Court's duty to resolve "any and all doubts" in the favor of the party opposing Rule 11 sanctions, Rodick, 1 F.3d at 1350, the Court concludes that there was "some arguable basis for" commencing this action, Perez v. Posse Comitatus, 373 F.3d 321, 326 (2d Cir. 2004). The Sanctions Motion is therefore denied.

### I. Leave to Amend

During the August 2018 Conference, Plaintiff's counsel requested that, should the Court decide to grant Defendants' motions to dismiss, Plaintiff be granted an opportunity to "refile [his] papers." Aug. 2018 Conference Tr. at 3. Smith's counsel objected to the request. Id. at 4. In the weeks following the August 2018 Conference, however, neither Plaintiff nor Defendants submitted any filings regarding Plaintiff's request.

Rule 15 of the Federal Rules of Civil Procedure commands that "[t]he court should freely give leave [to amend] when justice so requires." Therefore, when a complaint is dismissed for the first time pursuant to Rules 12(b)(6) or 12(c), leave to amend before reviewing the proposed amended pleading should typically be withheld only if amendment would be futile—namely, if it is clear from the facts alleged that the events in question cannot give rise to liability and would not withstand a subsequent motion to dismiss. Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) ("As a matter of procedure, when a complaint is dismissed pursuant to Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted." (citations omitted)); see also In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 157 (2d Cir. 2016) (discussing affirmance of dismissal without leave to amend due to futility); Orchard Hill Master Fund Ltd. v. SBA Commc'ns. Corp., 830 F.3d 152, 156 (2d Cir. 2016) (noting that denial of leave to amend on futility grounds is subject to de novo review); Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 191 (2d Cir. 2015) (holding that, by not allowing plaintiffs to submit a new pleading attempting to correct any deficiencies, the district court "violated the liberal spirit of Rule 15" (quoting Williams v. Citigroup, Inc., 659 F.3d 208, 214 (2d Cir. 2011) ) ).

Bearing in mind its foregoing analysis, the Court finds that allowing amendment of most of Plaintiff's claims would prove futile, because no amendment would allow them to survive a motion to dismiss. However, there are certain claims

that, if pled with more particularity, *may* prove sufficiently plausible to give rise to liability. The Court will therefore grant Plaintiff forty-five days to move to amend his pleadings only insofar as they relate to his claims of (1) conspiracy against McNally; (2) malicious prosecution and conspiracy against the Browns; (3) conspiracy against McInerney; and (4) malicious prosecution and conspiracy against Ogden. Once Plaintiff has so moved, Defendants may respond and the Court can assess the proposed amendments' viability and the other factors governing leave to amend. [10] The Court will not consider or allow any attempts by Plaintiff either to replead any of his other claims or to plead additional claims not mentioned in the original Complaint.

[10]  Plaintiff should note that any motion to amend he may choose to file must comply with the Local Rules, L.R. 7.1(a)(4), and must fully address the deficiencies identified in this Memorandum-Decision and Order. Should he fail to comply with any of those requirements, Plaintiff's motion will be denied and his claims dismissed with prejudice. See, e.g., Burrowes v. Combs, 124 F. App'x 70, 71 (2d Cir. 2005) (affirming the district court's dismissal without further leave to amend after a previous amendment was unsuccessful).

### V. CONCLUSION

**\*23**  Accordingly, it is hereby:

**ORDERED**, that the Brown Motion (Dkt. No. 24) is **GRANTED**; and it is further

**ORDERED**, that the McNally Motion (Dkt. No. 29) is **GRANTED**; and it is further

**ORDERED**, that the McInerney Motion (Dkt. No. 40) is **GRANTED**; and it is further

**ORDERED**, that the Ogden Motion (Dkt. No. 57) is **GRANTED**; and it is further

**ORDERED**, that the Smith Motion (Dkt. No. 66) is **GRANTED**; and it is further

**ORDERED**, that the Rensselaer Motion (Dkt. No. 96) is **GRANTED**; and it is further

**ORDERED**, that the Sanctions Motion (Dkt. No. 58) is **DENIED**; and it is further

**ORDERED**, that if Plaintiff wishes to proceed with his (1) conspiracy claims against McNally; (2) malicious prosecution and conspiracy claims against the Browns; (3) conspiracy claim against McInerney; and (4) malicious prosecution and conspiracy claims against Ogden, he must file a motion to amend his complaint, in accordance with the Local Rules, within **forty-five days** from the date of this Memorandum-Decision and Order; and it is further

**ORDERED**, that if Plaintiff fails to timely file a motion to amend as directed above, the Clerk shall enter judgment indicating that this action is **DISMISSED with prejudice** without further order of this Court; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4565768

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 1702004

United States District Court,
S.D. New York.

Dean LOREN, Plaintiff,

v.

Harold O. LEVY, Chancellor of the New York
City Board of Education, et al., Defendants.

No. 00 Civ. 7687(DC).
|
March 31, 2003.

**Attorneys and Law Firms**

Dean Loren, New York, New York, pro se Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New
York, By: Nadia A. Wallace, Assistant Corporation Counsel,
New York, New York, for Board Defendants.

Elliot Spitzer, Attorney General of the State of New York, By:
Clement J. Colluci, Assistant Attorney General, New York,
New York, for State Defendants.

*MEMORANDUM DECISION*

CHIN, J.

**\*1** *Pro se* plaintiff Dean Loren brings this action against
various municipal and state officials and agencies alleging
wrongful termination of his participation in the New York
City Teaching Fellows Program (the "Program"), an initiative
to encourage and train professionals to teach in the New
York City public schools. Specifically, Loren alleges that his
dismissal resulted from discrimination on the basis of his
disability and/or retaliation for his reports of corruption and
mismanagement in a New York City high school. Broadly
construed, the complaint asserts claims under Title I of the
Americans with Disabilities Act (the "ADA") and 42 U.S.C.
§ 1983, as well as claims for breach of contract and for
violations of federal and state whistleblower statutes and state
and city discrimination laws.

Defendants move for summary judgment. For the reasons set
forth below, the motions are granted and the second amended
complaint is dismissed.

*BACKGROUND*

A. *The Facts*
Construed in a light most favorable to Loren, the facts are as
follows:

1. *The Parties*
Loren holds a law degree and a bachelor's degree in chemistry
and has teaching experience as well. (PX at 78, 79, 84). [1] For
purposes of these motions, I assume that he had the credentials
necessary to participate in the Program. Loren is, and has been
since 1991, HIV positive. (*Id.* at 18-25).

[1]    In opposition to the summary judgment motions,
Loren submitted a set of exhibits numbered
consecutively by page. References to "PX at __"
are to the relevant pages of the exhibit volume.

Defendants are the New York City Board of Education
(the "Board") and its Chancellor, Harold O. Levy (together,
the "Board Defendants"), and Richard Mills, New York
State Commissioner of the New York State Department
of Education (the "Department"), and Herman Badillo,
Chairman of the Board of Trustees of the City University of
New York ("CUNY") (together, the "State Defendants"). [2]
Levy, Mills, and Badillo are sued in their official capacities
only. (2d Am Compl. ¶¶ 6, 14, 18).

[2]    CUNY, the Department, and the City University
of New York Research Foundation (the
"Foundation") were also named as defendants in
this action, but the claims against them have
been dismissed. *See Loren v. Levy,* No. 00 Civ.
7687(DC), 2001 WL 921173, at \*7 (S.D.N.Y. Aug.
14, 2001).

2. *Loren's Activities at MLK*
Beginning in 1997 or 1998, Loren became involved in
various activities relating to Martin Luther King High School
("MLK"), a public high school in New York City. (*See*
PX at 230, 235). In 1998, 1999, and 2000, Loren wrote
numerous letters complaining of, *inter alia,* corruption, fraud,
and racism at MLK and other New York City schools
and at the Board. (*See, e.g., id.* at 207 (complaining
of "massive attendance fraud and phantom classes"), 230
(complaining of "unauthorized expenditures" and "theft of
federal funds"), 232 (complaining of "corruption," "cover-

up" by District Attorney's offices, and "racist and prejudicial" hiring of teachers), 234 (complaining of "systemic corruption among the support staff at the superintendent level"), 235 (complaining of "kick-back scam" and embezzlement of "millions of dollars"), 259 (complaining that "scores of students taking the April '98 Readings Tests were altered"). Apparently, the letters were sent to, among others, President Clinton, Vice President Gore, Mayor Giuliani, Chancellor Crew, Chancellor Levy, Senator Schumer, the Reverend Al Sharpton, the Washington Post, the New York Times, the Los Angeles Times, the New York Post, and the Daily News. (*Id.* at 207, 230, 232, 259). The Board responded to some of the letters. (*Id.* at 231, 237, 247).

**\*2** In June 1998, Loren spoke at a public Board meeting. There he met and spoke with Vicki Bernstein, who at that time supervised the Board's Summer School Attendance and Promotion Policies Projects. Bernstein thought Loren's demeanor was "odd" and that he was "[not] particularly rational." (Bernstein Dep. at 45-46).

### 3. *The Program*

The Program is an employment and training program intended to provide an alternate route to teaching for professionals and other non-traditional teaching candidates. (*See, e.g.,* PX at 17). State regulations adopted in July 2000 require that all public school teachers complete a pre-service training program provided by an institution of higher education with a registered teacher education program. In 2000, the Board entered into a partnership with CUNY and the Foundation to provide an accelerated educational program as part of the Program. (*See* 2d Am. Compl. Ex. 1).

### 4. *Loren Enters the Program*

By letter dated July 12, 2000, Loren applied for a position in the Program, responding to an advertisement in the New York Times. (5/24/02 Loren Dep. at 104-07; Wallace Decl. Ex. 9). He was interviewed on July 27, 2000 by Monica Brady, a Board employee; she selected him for the Program. (5/24/02 Loren Dep. at 105, 110; Brady Dep. at 12-13, 18; Wallace Decl. Ex. 10).

Loren received voicemail messages on July 28 and 30, 2000, telling him he was being offered a position in the Program. (5/24/02 Loren Dep. at 123-24). He responded by telephone the morning of July 31, 2002, and was told to report to LaGuardia High School the same day for an opening ceremony and the first day of training. (*Id.* at 125-26;

Bernstein Dep. at 44; Wallace Decl. Ex. 10). He arrived at LaGuardia High School around 1 p.m. (5/24/02 Loren Dep. at 140).

### 5. *Bernstein's Inquiry*

During lunch with colleagues on July 31, 2000, Vicki Bernstein, who was then the Assistant to the Deputy Chancellor for Operations at the Board, learned that Loren was one of the new Teaching Fellows. She recognized his name from their previous meeting in June 1998, and remembered hearing that he had exhibited inappropriate behavior with other Board employees. (Bernstein Dep. at 44-45). She expressed her concern that Loren was not an appropriate candidate for the Program. (*Id.* at 45).

Around 3:30 p.m., Bernstein borrowed a cell phone from a colleague and called the Board to elicit more information about Loren from other Board employees. Bernstein spoke with a Board employee, Pat Haith, who recalled an incident in which Neal Harwayne, the Administrative Assistant Superintendent, summoned security to remove Loren from a building. (Bernstein Dep. at 49-50; Haith Dep. at 15). Harwayne later confirmed this story. (Harwayne Dep. at 64). Bernstein next spoke with another Board employee, Burt Sacks, who told her that he had asked Loren to leave a non-public training session for school board members at Stuyvesant High School in June 1997. Loren apparently resisted his request, despite Sacks's threat to have him removed by security. When Sacks finally summoned a security guard, Loren left the building without a struggle. (Sacks Dep. at 28-29).

**\*3** After speaking with Sacks and Haith, Bernstein called Chad Vignola, the General Counsel to the Board. Bernstein told Vignola that based on her inquiries and her own experience, she did not think Loren was appropriate for the Program, and asked about the correct process for dismissing him. Vignola advised Bernstein that based on her information, she should dismiss Loren at the outset rather than allow him to proceed through the program. (Vignola Dep. at 30-32). Vignola advised Bernstein that she did not need to give Loren a reason for the dismissal and that he was not entitled to a position. He said that she could refer Loren to the General Counsel's office if he had questions. (*Id.* at 32).

At 4:42 p.m., after speaking with Bernstein, Vignola sent an e-mail to Robin Greenfield, an attorney in the general counsel's office, inquiring whether she knew of "[D]ean [L]oren" who

was "associated with [M]artin [L]uther [K]ing H.S." (PX at 306A; Vignola Dep. at 30).

During a break at 5:30 p.m. Bernstein visited the training area, where she visually identified Loren as the man she had met in 1998. (Bernstein Dep. at 63). Loren also recognized her. (5/24/02 Loren Dep. at 143-44). According to Bernstein, she had by that point decided to dismiss him from the Program, based on her own prior interaction with Loren and her conversations with Haith, Sacks, and Vignola, but she decided to wait until the end of the day to tell him so as not to disrupt the training session. (Bernstein Dep. at 65, 102; *see also* Vignola Dep. at 30-33).

6. *Loren's Dismissal*
During a break at approximately 5:45, Loren approached an instructor, Monica Brady, to ask about a medical form. He told her that he was "HIV positive" and asked about the Board's HIV policy. (5/24/02 Loren Dep. at 143-45; PX at 26). Afterwards, Brady approached Bernstein and stated that "she had heard she picked a 'crazy' person, and said that [Loren] had just told her that he was HIV positive." (PX at 26). Loren had not previously discussed his medical condition with anyone involved in the Program, nor did he submit any medical records in connection with his application to the Program. (6/20/02 Loren Dep. at 5-7).

At approximately 6:45, at the close of the day's activities, Bernstein told Loren that he was "terminated from the fellowship." (5/24/02 Loren Dep. at 149). Bernstein did not state a reason for the dismissal. (*See* 2d Am. Compl. ¶ 75).

7. *The State Defendants*
Mills is the Commissioner of the Department, and state regulations govern the Commissioner's duties with regard to the Program. *See* 8 N.Y.C.R.R. § 52.21(b)(3)(xvii). The Department has two responsibilities with respect to alternative teacher certification programs: to ensure that alternative teacher certification programs offered by colleges and universities satisfy regulatory requirements; and to issue teaching certificates to candidates who successfully complete the programs. *See id.* In the summer of 2000, the Department determined that the Program met the alternative teacher certification program requirements. (Frey Aff. ¶¶ 7-9; Ex. A).

**\*4** CUNY reviews the academic credentials of candidates for the Program to determine whether they are eligible for matriculation at CUNY and certifies to the Department

that the Fellows possess the requisite credentials. (Michelli Aff. ¶¶ 7-8). CUNY does not determine who is selected to be a Teaching Fellow. The contract governing CUNY's relationship with the Fellows Program obligates it to provide teaching services to Fellows in a non-discriminatory manner. It does not empower it "to police the Board's compliance with applicable anti-discrimination laws in selecting Teaching Fellows." (*Id.* ¶ 9, Ex. A 000186, 000230-31).

B. *Prior Proceedings*
On September 7, 2000, Loren filed a notice of claim against the City of New York based on his dismissal from the Program. (2d Am.Compl.¶ 84).

Loren brought the instant case on October 12, 2000, at which time he was granted leave to proceed *in forma pauperis.* By order dated the same day, Chief Judge Michael B. Mukasey directed Loren to file, within sixty days, an amended complaint alleging exhaustion of administrative remedies. On October 31, 2000, after obtaining a right-to-sue letter from the Equal Employment Opportunity Commission, Loren filed an amended complaint. At a conference on January 26, 2001, this Court granted Loren leave to file a second amended complaint. Loren did so on February 8, 2001.

The second amended complaint asserts six claims. The principal claims appear to be: (1) claims for wrongful dismissal from the Program based on Loren's HIV status in violation of the ADA and unspecified state or city discrimination laws (*Id.* ¶¶ 1, 24, 123, 124, 126), and (2) a claim under § 1983 alleging that he was dismissed in retaliation for exercising his First Amendment rights, *i.e.,* by complaining of the alleged misconduct at MLK and elsewhere. (*Id.* ¶¶ 1, 123, 124, 125, 126). In addition, the second amended complaint appears to assert claims for breach of contract and violation of unspecified "federal and state whistleblower laws." (*Id.* ¶¶ 1, 24, 123-28). Loren seeks both monetary and injunctive relief.

On August 14, 2001, I granted the State Defendants' motion to dismiss the claims against them, except for the First Amendment claims for injunctive relief against defendants Mills and Badillo in their official capacities, and denied Loren's motion for summary judgment and related relief in all respects.

After the completion of discovery, these motions followed.

*DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter [but to] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

**\*5** To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U .S. at 586 (citation omitted). The nonmoving party "must present 'concrete particulars' and cannot succeed with purely conclusory allegations." *Fitch v. R.J. Reynolds Tobacco Co.,* 675 F.Supp. 133, 136 (S.D.N.Y.1987) (citation omitted). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249-50. As the Court held in *Anderson,* "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id* . at 249-50 (citations omitted).

B. *The Board Defendants' Motion*

The Board Defendants move for summary judgment dismissing all of Loren's claims against them. I address the disability discrimination claims, the First Amendment claim, and the remaining claims, in turn.

1. *The Disability Claims*

The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to ... [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Buckley v. Consol. Edison Co.,* 155 F.3d 150, 153-54 (2d Cir.1998). As the Seventh Circuit has noted, "Congress enacted the ADA to 'level the playing field' for disabled

people. Congress perceived that employers were basing employment decisions on unfounded stereotypes." *Siefken v. Vill. of Arlington Heights,* 65 F.3d 664, 666 (7th Cir.1995). For the purposes of these motions, there are no significant differences between the ADA and the New York state and city discrimination laws, *see generally Burton v. Metropolitan Transportation Authority,* No. 01 Civ. 72(DC), 2003 WL 345361, at *3-4 (S.D.N.Y. Feb. 12, 2003), and thus I limit my discussion to the ADA claims.

To survive this motion for summary judgment, Loren must present sufficient evidence from which a reasonable jury could find that: (1) defendants are covered by the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *See Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001) (citations omitted). Here, I assume that Loren has presented sufficient evidence from which a jury could find the first three elements as well as the adverse employment action aspect of the fourth element. I conclude, however, based on the evidence before the Court, that no reasonable jury could find the causation portion of the fourth element-that Loren's HIV status was a motivating factor in the Board's decision to dismiss him.

Loren's evidence of discrimination is minimal. Loren asserts that he was dismissed shortly after he advised Brady that he was HIV positive. He has presented no evidence other than the temporal proximity of his conversation with Brady to his conversation with Bernstein to show a causal connection between his disability and the Board's decision to dismiss him. Loren concedes that he had no other conversations with anyone involved with the Program about his medical condition before he was dismissed, and he likewise concedes that he submitted no medical records in connection with his application to the Program.

**\*6** Loren relies on two other pieces of evidence, but to no avail. First, he argues that the medical questionnaire used by the Program constitutes evidence of disability discrimination because it purportedly is geared toward revealing an applicant's HIV status. According to Loren, the questionnaire asked "classic questions targeting HIV/AIDS," such as those regarding "serious illness, hospitalizations, current medications, changes in weight, strength, sleep and/ or appetite, recent fever, night sweats, difficulty walking, fatigue, [and] easy bruising." (Pl. Mem. at 3; *see* PX

2003 WL 1702004, 25 NDLR P 302

34-39). Although such conditions may be associated with HIV and AIDS, they are also symptoms of many other, unrelated illnesses that could conceivably bear on an applicant's qualifications for the position. No reasonable jury could conclude, on the record before the Court, that the questionnaire constitutes evidence of discrimination against Loren because of his HIV status.

Second, Loren argues that a memorandum to "File" written by Bernstein dated August 2, 2000 constitutes evidence of disability discrimination. (PX at 26). The memorandum, however, confirms that Bernstein decided to dismiss Loren *before* Brady had her conversation with him. (*Id.*). Hence, the memorandum undercuts rather than supports the claims of discrimination.

In contrast to the weak evidence presented by Loren, the Board Defendants submit substantial, concrete evidence-uncontradicted in any meaningful way-that Bernstein decided to dismiss Loren from the Program before she was told by Brady of her conversation with Loren. Indeed, she decided to dismiss him because of his odd and disruptive behavior in the past, which had twice required the intervention of security officers. Bernstein drew not just from her own interaction with Loren in June 1998 but from her conversations with Sacks, Haith, and Vignola. (Bernstein Dep. at 45, 57-58; Vignola Dep. at 30; Haith Dep. at 15; Sacks Dep. at 28). Indeed, the Board Defendants' evidence demonstrates that:
- During Bernstein's prior interaction with Loren, he seemed "odd" and not "particularly rational";

- After learning that Loren had been accepted as a Teaching Fellow, Bernstein called the City Board's central office and spoke with Haith, Sacks, and Vignola, at approximately 3:30 p.m.;

- Haith recalled an incident where Harwayne had security remove Loren from a building;

- Sacks recalled an incident where he summoned security to remove Loren from a non-public training session for school board members at Stuyvesant High School;

- Vignola advised Bernstein that the information she culled constituted an informal background check, and that it was permissible to dismiss Loren on the basis of what she learned about his past behavior and her own experience with him;

- During a break at 5:30 p.m., Bernstein visually identified Loren as the man with whom she had previously interacted;

- Bernstein decided, based on her experience and her conversations with Haith, Sacks and Vignola, to dismiss Loren from the Program but she also decided to wait to do so until the end of the training session;

 **\*7**  - Bernstein was not aware that Loren had revealed his HIV status to Brady until after Bernstein had decided to dismiss him.

Loren challenges the evidence that shows that Bernstein telephoned Haith, Sacks, and Vignola. He presents cell phone records of Talia Kohorn, a Program employee who was at lunch with Bernstein, to demonstrate that the calls were not made. Kohorn's records, however, do not raise an issue of fact, as Bernstein testified that she might have borrowed the cell phone from another colleague, Carla Oakley. (Bernstein Dep. at 47). Loren is left with mere speculation and conclusory denials.

Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in Loren's favor, I conclude that no reasonable juror could find that Loren was discharged from the Program because of his disability. While Loren's dismissal came shortly after his inquiry as to the Board's HIV policy, he has provided no other evidence to show that his HIV positive status, rather than his past inappropriate behavior, was the cause of his dismissal. *See Reeves v. Johnson Controls World Servs.,* 140 F.3d 144, 153 (2d Cir.1998) ("the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate ... that the perception caused the adverse ... action"). That Brady told Bernstein that Loren had "just told her he was HIV positive" is immaterial because Bernstein presents uncontested evidence that she had decided to dismiss Loren prior to this conversation. He does not allege that anyone at the Board ever said anything to him about his HIV status. Loren's speculation as to the sequence of events leading to his dismissal is insufficient to create a genuine issue of material fact. Therefore, the Board Defendants' motion for summary judgment is granted as to Loren's disability discrimination claims under the ADA and state and city law.

### 2. The First Amendment Claim
To prevail on a First Amendment retaliation claim, a public employee must prove that: (1) the speech at issue was

2003 WL 1702004, 25 NDLR P 302

protected; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected speech and the adverse employment action. *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994); *see Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283-87 (1977). Even if the government establishes all three elements, a governmental employer may avoid liability by showing that it would have taken the same adverse employment action in the absence of the protected speech. *Mount Healthy,* 429 U.S. at 287; *see also Connick v. Myers,* 461 U.S. 138, 150 (1983).

In addition, where, as here, the defendant is in essence a municipality (or a municipal agency or a municipal official sued only in his official capacity), the municipality cannot be held liable under § 1983 solely on a theory of respondeat superior. *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 691 (1978). A municipality, however, may be liable under § 1983 when the deprivation of constitutional rights is a result of action taken pursuant to an official municipal policy. *Id.* at 690-91; *see City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). A plaintiff need not show that the municipality had an explicitly stated rule or regulation; instead, a plaintiff may show that the municipality exhibited deliberate indifference to the possibility of such a constitutional violation. *Vann v. City of New York,* 72 F.3d 1040, 1048-49 (2d Cir.1995).

**\*8** A municipality may also be subject to liability for the single act of an official with final decision-making authority. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986) (plurality opinion); *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000). Where a plaintiff contends that the action complained of was "taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Jeffes,* 208 F.3d at 57 (citing *St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) (plurality opinion)); *see also McMillan v.. Monroe County,* 520 U.S. 781, 785 (1997) (court must determine if the official is a final policymaker "for the local government in a particular area, or on [the] particular issue" in question). In making this determination, the court is to consider "state and local ... law, as well as custom or usage having the force of law." *Jeffes,* 208 F.3d at 57 (citation omitted).

As a threshold matter, I have serious doubts as to whether a reasonable jury could find that Loren engaged in protected speech. Although he wrote numerous, highly critical letters in 1998, 1999, and 2000 complaining of fraud, corruption, and racism at MLK and elsewhere in the public school system, the statements were hardly rational. Rather, they were hostile in tone and inappropriate in language, and were sent to, among others, the President and Vice President of the United States.

Even assuming Loren's statements were protected by the First Amendment, summary judgment must be granted in favor of the Board Defendants, for at least three reasons: (1) no reasonable jury could find a causal link between the speech and Bernstein's decision to dismiss Loren; (2) even assuming Bernstein was aware of the speech, a reasonable jury could only find that Bernstein had good reason to dismiss Loren anyway; and (3) no reasonable jury could find that Loren was dismissed because of an official municipal policy.

First, on this record no reasonable jury could find a causal connection between the speech and the Board's decision to dismiss Loren. Loren has presented no evidence to show that Bernstein-the decision-maker here-was even aware of the letters or his other "protected speech." Although she did interact with him in 1998, she was concerned not about his speech but about his "odd" behavior-he was not "particularly rational." [3]

> [3]    The e-mail from Vignola to another lawyer at the Board is arguably some evidence of an awareness on the part of the Board of Loren's activities in connection with MLK, but there is nothing in the record to suggest that Bernstein was aware of these activities.

Second, even assuming Bernstein was aware of the criticisms, a reasonable jury could only find that she had good reason to dismiss him anyway. In addition to her own experience, Bernstein was advised of two other separate incidents where Loren acted poorly-to such an extent that the intervention of security guards was required. It was for these reasons that Bernstein concluded that Loren did not belong in the Program. Loren has presented no evidence from which a rational jury could find that Bernstein decided to dismiss Loren to punish him for his criticisms of MLK and other Board personnel.

**\*9** Loren's letters complaining of corruption and wrongdoing only confirm that Bernstein had more than a sufficient basis to conclude that Loren was not fit to be a

public school teacher. The letters used intemperate, nasty, and paranoid language, and certainly appeared to have been written by someone who was not stable. In light of the letters and Loren's "odd" and not "particularly rational" behavior on one occasion and his conduct that required the intervention of security guards on two other occasions, a reasonable jury could only conclude that Bernstein acted responsibly in deciding that, notwithstanding his credentials, Loren was not fit to be in a classroom.

Third, no reasonable jury could find that Loren was dismissed from the Program because of an official municipal policy. Loren has submitted evidence of alleged retaliation by officials at MLK against others who complained of wrongdoing at MLK. (Pl.Ex. at 165, 177-78, 183-95, 196-97). Even assuming that these submissions constitute some evidence of corruption within the New York City school system, and at MLK in particular, they do not demonstrate "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" at issue in this case. *City of Canton v. Harris,* 489 U.S. 378, 385 (1989).

This case does not involve allegations of deliberate indifference by the Board to a pattern of retaliatory practices by officials at MLK. Here, Loren alleges that he was retaliated against by administrators of the Program. He cannot sustain a claim against the Board simply by showing that a pattern of retaliation allegedly existed somewhere in the New York City school system; he must present evidence that he was dismissed because of an official policy of the Board, and he has not done so. Nor has he presented any evidence to show that the Board acted with deliberate indifference to the possibility of a violation of his constitutional rights.

Finally, even assuming the dismissal was retaliatory, no basis for municipal liability has been shown, for Bernstein is not an official with policy-making authority. *See City of Oklahoma City,* 471 U.S. at 823-24; *Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991) (single incident involving "only actors below the policy-making level[ ] does not suffice to show a municipal policy").

New York Education Law §§ 2590-h(1)(d) and (19) gives the Chancellor authority to delegate the enforcement of anti-discrimination laws to subordinate officers and employees. New York Education Law §§ 2590-h(1)(d), (19) (McKinney 2003). Loren asserts that Chancellor Levy delegated his authority to discipline or dismiss Fellows to Bernstein, and that her dismissal of him in retaliation for protected speech

subjects the Board to liability. Loren has not presented evidence, however, from which a reasonable jury could find that Bernstein had final policy-making authority over the selection of candidates for the Program. Bernstein worked for Deputy Chancellor Klasfeld, who was responsible for "human resources," including long-term alternative recruitment efforts such as the Program. (Bernstein Dep. at 11). The record shows merely that Bernstein was an administrator of the Fellows Program, a pilot project then within the domain of "human resources." Any authority Bernstein had to enforce the anti-discrimination laws would have been delegated by Deputy Chancellor Klasfeld, not Chancellor Levy, as Klasfeld was responsible for human resources at the City Board. Hence, while she may have had authority to dismiss Fellows during the conditional, orientation period, Bernstein did not occupy a position of final policy-making authority with respect to the hiring and firing of Fellows.

**\*10** For these reasons, the Board Defendants' motion for summary judgment is granted as to the First Amendment claim.

### 3. *The Remaining Claims*

Loren also asserts claims against the Board Defendants for breach of contract and for violation of federal and state whistleblower laws. Summary judgment is granted dismissing these claims as well.

First, for the reasons set forth above, no reasonable jury could find that the Board dismissed Loren without cause or for criticizing MLK and other Board officials. Rather, a reasonable jury could only conclude that Bernstein decided to dismiss Loren because of his prior irrational and inappropriate behavior. Hence, a reasonable jury could not find a breach of contract on the part of the Board or any causal connection between Loren's criticisms of the Board and its decision to dismiss him.

Second, although Loren filed a proof of claim with New York City, he did not file a proof of claim with the Board. The filing of such a proof of claim is a condition precedent to the commencement of any action under state law against a school district or any of its officers. N.Y. Educ. Law § 3813(1) (McKinney 2001); *see Parochial Bus Syst. v. Board of Educ.,* 470 N.Y.S.2d 564, 568 (1983); *Campbell v. City of New York,* 611 N.Y.S.2d 248, 249 (2d Dep't 1994) ("[I]t is well settled that the Board of Education and the City of New York are separate and distinct entities and service of a notice of claim

upon the City shall not constitute service upon the Board."); *Gold v. City of New York,* 437 N.Y.S.2d 973, 974 (1st Dep't 1981) (same).

Third, Loren simply has not stated a viable whistleblower claim. No federal whistleblower statute is applicable. Nor is § 740 of the New York State Labor Law applicable, for it does not apply to public employers. N.Y. Labor Law § 740 (McKinney 2002); *see Markovic v. New York City School Constr. Auth.,* No. 99 Civ. 10339(AGS), 2002 U.S. Dist. LEXIS 214, at *12 (S.D.N.Y. Jan. 7, 2002). Section 75-b of the Civil Service Law does apply to public employers, but Loren may not rely on it for at the time of the alleged protected activity (his criticisms of MLK and other Board personnel), he was not employed in the Program and was not otherwise a public employee. N.Y. Civil Serv. Law § 75-b(2) (a) (McKinney 1999).

Accordingly, summary judgment is granted as to the remaining claims against the Board Defendants as well.

## C. *The State Defendants' Motion*

The sole claim remaining against the State Defendants is Loren's First Amendment claim against Badillo and Mills in their official capacities for injunctive relief reinstating him to the Program and compelling the Department to conduct an investigation into the alleged misconduct in the New York City school system.

The State Defendants move for summary judgment dismissing the claims against them on the grounds that they have no responsibility for the actions of the Board Defendants; that they had no notice of Loren's "whistleblowing activities," and that an injunction against them is superfluous and pointless. For the following reasons, their motion is granted.

**\*11** Unlike a claim for damages under § 1983, a claim for injunctive relief brought against a state official in his or her official capacity does not require personal involvement on the part of the named official. *See Davidson v. Scully,* 148 F.Supp.2d 249, 254 (S.D.N.Y.2001). "Rather, actions involving claims for prospective declaratory or injunctive

relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Id.* (quoting *Marshall v. Switzer,* 900 F.Supp. 604, 615 (N.D.N.Y.1995)) (internal quotation marks omitted); *see also Ex parte Young,* 209 U.S. 123, 157 (1908) (holding that a state officer named as a defendant in a suit for injunctive relief "must have some connection with the enforcement of the [allegedly unconstitutional] act"). An injunction may issue only "in circumstances where the state official has the authority to perform the required act." *Schallop v. New York State Dep't of Law,* 20 F.Supp.2d 384, 391 (N.D.N.Y.1998).

Here, for the reasons set forth above, Loren's First Amendment claim must be dismissed on the merits. Moreover, even assuming Loren has a viable First Amendment retaliation claim, the record shows, as a matter of law, that Mills and Badillo do not have the authority to reinstate Loren to the Program. Neither Mills nor Badillo, personally or through their respective agencies, has any responsibility for hiring or dismissing teachers from the Program. Rather, as the undisputed facts show, Loren was hired and fired by Board employees, without any input from any employee of the Department or CUNY. Accordingly, the State Defendants' motion for summary judgment is granted as well.

## CONCLUSION

For the foregoing reasons, the Board Defendants' motion for summary judgment is granted, as is the State Defendants' motion for summary judgment. The second amended complaint is dismissed in all respects, with prejudice and with costs, but without attorneys' fees. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 1702004, 25 NDLR P 302

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01014-BKS-MJK    Document 4    Filed 08/23/24    Page 46 of 63

Kelly v. New York State Unified Court System, Not Reported in Fed. Rptr. (2022)

2022 WL 1210665

2022 WL 1210665
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

James KELLY, Plaintiff-Appellant,

v.

NEW YORK STATE UNIFIED
COURT SYSTEM, Defendant-Appellee,

No. 21-1633
|
April 25, 2022

Appeal from a judgment of the United States District Court for the Eastern District of New York (Azrack, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Plaintiff-Appellant: James Kelly, pro se, Selden, NY.

For Defendant-Appellee: Lisa Michelle Evans, Of Counsel (Eileen D. Millett, Craig E. Penn, on the brief), New York State Unified Court System, New York, NY.

PRESENT: Amalya L. Kearse, Robert D. Sack, Steven J. Menashi, Circuit Judges.

**SUMMARY ORDER**

*1  James Kelly, pro se, sued the New York State Unified Court System ("UCS"), challenging a February 2021 New York state court order that he could not record custody and visitation proceedings to which he was a party. He alleged that the order—along with N.Y. Civil Rights Law § 52 and accompanying regulations prohibiting individuals from recording or broadcasting proceedings within UCS courtrooms [1]—violated the First, Tenth, and Fourteenth Amendments. He requested a temporary restraining order and a preliminary injunction to prevent the UCS from prohibiting him from recording his state court proceedings. The district court *sua sponte* dismissed Kelly's complaint for lack of subject matter jurisdiction because state sovereign immunity barred the complaint. The district court also denied leave to amend because amendment would be futile. Kelly appeals.

We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

[1]  N.Y. Civil Rights Law § 52 provides that "[n]o person, firm, association or corporation shall televise, broadcast, take motion pictures or arrange for the televising, broadcasting, or taking of motion pictures within this state of proceedings, in which the testimony of witnesses by subpoena or other compulsory process is or may be taken, conducted by a court ... or other tribunal in this state." The New York Codes, Rules & Regulations ("NYCRR") provide that "[t]aking photographs, films or videotapes, or audiotaping, broadcasting or telecasting, in a courthouse including any courtroom, office or hallway thereof, at any time or on any occasion, whether or not the court is in session, is forbidden, unless permission of the Chief Administrator of the Courts or a designee of the Chief Administrator is first obtained." 22 NYCRR § 29.1(a). Additionally, under 22 NYCRR § 131.1(c), "[a]udio-visual coverage of party or witness testimony in any court proceeding (other than a plea at an arraignment) is prohibited."

**I**

Sua sponte dismissals under Rule 12(b)(1) for lack of subject matter jurisdiction are reviewed *de novo. Digitel, Inc. v. MCI Worldcom, Inc.*, 239 F.3d 187, 190 (2d Cir. 2001). While issuing such a dismissal without affording the complainant an opportunity to be heard is generally "bad practice," *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018), and while a *sua sponte* dismissal "absent notice and an opportunity to be heard can itself be grounds for reversal," *McGinty v. New York*, 251 F.3d 84, 90 (2d Cir. 2001), it nevertheless "may be appropriate" when "it is unmistakably clear that the court lacks jurisdiction." *Catzin*, 899 F.3d at 82.

Here, it was "unmistakably clear" that the district court lacked jurisdiction to hear Kelly's complaint because it was barred by state sovereign immunity. *Id.* The Eleventh Amendment confirms that states, state entities, and state officials acting in their official capacities have sovereign immunity from suit. *See* U.S. CONST. amend. XI; *see also In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005) ("For over a century, the Supreme Court has interpreted the Eleventh Amendment not as against a *tabula rasa,*

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 47 of 63

Kelly v. New York State Unified Court System, Not Reported in Fed. Rptr. (2022)

2022 WL 1210665

but rather as a confirmation of the preexisting principle of sovereign immunity."). We have held that New York's sovereign immunity extends to the UCS, which acts as an "arm of the [s]tate." *Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009) (quoting *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006)); *see also Gorton v. Gettel*, 554 F.3d 60, 62 (2d Cir. 2009) ("Eleventh Amendment immunity extends to state agents and state instrumentalities that are, effectively, arms of a state.") (internal quotation marks omitted).

**\*2** There are two primary exceptions to sovereign immunity: (1) a state may waive its immunity from suit, or (2) Congress may expressly and validly abrogate the immunity pursuant to specific authority, such as its authority under Section 5 of the Fourteenth Amendment. *See Clark v. Barnard*, 108 U.S. 436, 447 (1883) ("The immunity from suit belonging to a State ... is a personal privilege which it may waive at pleasure."); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) ("[W]e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of [Section] 5 of the Fourteenth Amendment.") (internal citation omitted). Neither of those exceptions applies here. New York did not expressly waive its immunity against Kelly's lawsuit, such as by consenting to the suit. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675-76 (1999) (noting that a state waives its immunity "if the State voluntarily invokes [federal court] jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to [federal court] jurisdiction") (internal quotation marks and citation omitted). Nor has New York generally waived its sovereign immunity in federal court regarding 42 U.S.C. § 1983 claims.[2] *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977) (holding that § 1983 claims against a New York commission were barred by sovereign immunity). Furthermore, Congress did not abrogate New York's sovereign immunity when enacting § 1983. *Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990) ("[S]ince Dube's federal causes of action are brought under section 1983, in the absence of consent, any claims against [New York] State ... are proscribed by the Eleventh Amendment.") (internal quotation marks and alterations omitted).

[2]   Because Kelly alleged that UCS "systematically deprived" him of constitutional rights "under color

of law," we construe his claims as arising under § 1983. App'x 16.

Kelly's argument that *Ex parte Young*, 209 U.S. 123 (1908), provides an exception to New York's sovereign immunity is meritless. The doctrine provides that a plaintiff "may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, *as opposed to the state*, in their official capacities," if the complaint "alleges an ongoing violation of federal law" and "seeks relief properly characterized as prospective." *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (emphasis added) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 636 (2002)). Kelly sued the UCS in lieu of individual officers (while also specifically alleging that any officer involved acted in a personal capacity). *Ex parte Young*'s exception to the sovereign immunity bar—allowing prospective injunctive relief—therefore does not apply.

To the extent that Kelly raises an argument of judicial bias, it is meritless. We have observed that "[g]enerally, claims of judicial bias must be based on extrajudicial matters." *Chen v. Chen Qualified Settlement Fund*, 552 F.3d 218, 227 (2d Cir. 2009). Kelly contends that the district court judge's *sua sponte* dismissal turned the judge into "a proponent for the defense." Appellant's Br. at 19. Yet "adverse rulings, without more, will rarely suffice to provide a reasonable basis for questioning a judge's impartiality." *Chen*, 552 F.3d at 227. The record does not demonstrate any bias from the district court judge, nor does Kelly point to extrajudicial information that could provide "a reasonable basis" to infer bias. *Id.*

## II

The Federal Rules of Civil Procedure provide that "leave to amend 'shall be freely given when justice so requires.' " *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)(2)). For pro se plaintiffs, a "complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). We review a denial of leave to amend "for abuse of discretion, unless the denial was based on an interpretation of law, such as futility, in which case we review the legal conclusion *de novo*." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (quoting *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216,

Case 5:24-cv-01014-BKS-MJK    Document 4    Filed 08/23/24    Page 48 of 63

Kelly v. New York State Unified Court System, Not Reported in Fed. Rptr. (2022)

2022 WL 1210665

224 (2d Cir. 2017)). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

**\*3** Here, the district court correctly denied leave to amend because it determined that "any amendment of [Kelly's] claims would be futile." App'x 354. As discussed above, Kelly's complaint is deficient because state sovereign immunity bars his claims against the UCS. *See Gollomp*, 568 F.3d at 368. Therefore, because Kelly cannot cure his pleading

deficiencies and amendment would be futile, the district court did not err in denying leave to amend.

We have considered all of Kelly's arguments, which are without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 1210665

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01014-BKS-MJK Document 4 Filed 08/23/24 Page 49 of 63

Mann v. New York State Court of Appeals, Not Reported in Fed. Supp. (2021)

2021 WL 5040236

2021 WL 5040236
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Matthew J. MANN, Plaintiff,

v.

The NEW YORK STATE COURT OF APPEALS;
the State of New York Supreme Court, Appellate
Division, Third Judicial Department; and the Attorney
Grievance Committee of the Supreme Court, Appellate
Division, Third Judicial Department, Defendants.

1:21-CV-49 (MAD/CFH)
|
Signed 10/29/2021

**Attorneys and Law Firms**

OF COUNSEL: DAVID B. CABANISS, ESQ., CABANISS
CASEY LLP, 4 Tower Place, Suite 100, Albany, New York
12203, Attorneys for Plaintiff.

OF COUNSEL: JORGE A. RODRIGUEZ, AAG, OFFICE
OF THE NEW YORK STATE ATTORNEY GENERAL, The
Capitol, Albany, New York 12224, Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, United States District Judge:

## I. INTRODUCTION

*1 Plaintiff, an attorney licensed to practice law in the
State of New York, commenced this action on January 15,
2021, seeking "intervention and declaratory judgment of this
Court in relation to improper, illegal, and unconstitutional
professional discipline imposed upon him by the Appellate
Division Third Judicial Department by Memorandum and
Order dated January 18, 2018." Dkt. No. 1 at ¶ 1. Upon
commencing this action, Plaintiff submitted an application
pursuant to Local Rule 5.3 to seal the complaint and "all
further papers in this action." Dkt. No. 2 at 1. In a March
31, 2021 Memorandum-Decision and Order, the Court denied
Plaintiff's motion to seal the complaint and all papers in this
action. *See* Dkt. No. 12.

Currently before the Court is Defendants' motion to dismiss
the complaint in its entirety. *See* Dkt. No. 13.

## II. BACKGROUND

Plaintiff is an attorney who has been duly licensed to practice
law in the State of New York since 1994. *See* Dkt. No. 1-1 at
¶¶ 7, 13. The named Defendants are the New York State Court
of Appeals, the Appellate Division, Third Department, and
the Attorney Grievance Committee of the Third Department.
*See id.* at ¶ 8.

According to the complaint, this case "involves the improper
discipline of an attorney in violation of state and federal law
by the Courts of the State of New York embodied collectively
as the named Defendants." *Id.* at ¶ 11. Plaintiff claims that
the conduct for which he was disciplined occurred at a time
when he was not acting as an attorney to any person and that
he did not render legal advice or counsel to any person; rather,
"it involved a conversation between friends which occurred
only after Plaintiff and the other participants acknowledged
in writing that it was not a conversation between individuals
and their attorney." *Id.* at ¶ 12.

In the underlying attorney misconduct petition, the petitioner
alleged that Plaintiff engaged in a conflict of interest
and conduct prejudicial to the administration of justice in
violation of Rules 1.7(a)(1) and 8.4(d) of the New York
State Rules of Professional Conduct. *See In re Matthew
J. Mann*, 157 A.D.3d 1160, 1161 (3d Dep't 2018). The
petitioner claimed that Plaintiff improperly prepared and
urged the execution of a child custody agreement purporting
to settle a dispute between parents and grandparents regarding
the care of the parents' minor children. *See id.* All of the
parties to the agreement were not only Plaintiff's friends to
a greater or lesser extent, but they were also persons that
Plaintiff was contemporaneously representing as clients in
separate legal matters unrelated to the custody dispute. *See id.*
After the grandparents commenced a proceeding in Albany
Count Family Court, Plaintiff prepared the custody agreement
unsolicited, without any input from the respective parties, and
without giving them the opportunity to review the matter in
advance of a meeting that he had arranged at his law office
for the purpose of presenting the agreement. *See id.* Although
Plaintiff inserted a provision into the agreement stating that
he was not representing any of the parties with respect to
the proposed custody arrangement, the petition of charges
asserted that Plaintiff, nevertheless, explained, discussed and
provided legal advice at the meeting regarding the custody
agreement. *See id.* After the parties were persuaded to

Case 5:24-cv-01014-BKS-MJK    Document 4    Filed 08/23/24    Page 50 of 63

Mann v. New York State Court of Appeals, Not Reported in Fed. Supp. (2021)

2021 WL 5040236

execute the agreement notwithstanding the father's initial objection, the dispute between the parties intensified and the grandparents, represented by separate counsel, did not settle the pending Family Court matter as provided in the agreement. *See id.*

**\*2** Complaints against Plaintiff were thereafter filed by the parents, who asserted that Plaintiff pressured them into executing a one-sided agreement that adversely affected their custody rights, without an adequate explanation of the risks of signing such an agreement, or providing a reasonable opportunity to seek independent counsel. *See In re Mann, 157 A.D.3d at 1161.* Plaintiff denied the allegations and a full hearing was conducted in June 2017, at which Plaintiff was represented by counsel. *See id.* Thereafter, the referee issued a report sustaining the petition of charges and rejecting Plaintiff's claims that he acted only as a disinterested mediator and that the parties to the agreement waived or consented to any conflict of interest. *See id.* at 1161-62.

On January 18, 2018, the Appellate Division, Third Department confirmed the referee's report and determined an appropriate disciplinary sanction. *See id.* at 1162. In determining the appropriate sanction, the Third Department considered Plaintiff's submissions in mitigation from colleagues and clients attesting to Plaintiff's good character and further noted the lack of proof that Plaintiff's misconduct stemmed from "any venal intent." *Id.* The Third Department also heard from the petitioner and observed that Plaintiff's "misconduct is aggravated by, among other things, his significant disciplinary history, which includes a two-year stayed suspension upon findings of conversion and escrow account mismanagement, ... which was later terminated upon [Plaintiff's] application, ... and private discipline in the form of two admonitions and a letter of caution." *Id.* Based on the facts presented, the Third Department determined that Plaintiff should be censured and that, within one year of the date of its decision, that Plaintiff must take and pass the Multistate Professional Responsibility Examination and complete six credit hours of continuing legal education in ethics and professionalism. *See id.*

Plaintiff appealed the Third Department's decision to the New York State Court of Appeals. On April 26, 2018, the Court of Appeals dismissed the appeal *sua sponte* upon the ground that no substantial constitutional question was presented. *See In re Mann, 31 N.Y.3d 1037 (2018).* Thereafter, the Court of Appeals denied Plaintiff's motion for reconsideration and his motion for reargument of his motion for leave to appeal. *See*

*In re Mann, 32 N.Y.3d 948 (2018); In re Mann, 32 N.Y.3d 1185 (2019).*

In his complaint dated January 15, 2021, Plaintiff brings the following causes of action against Defendants in relation to the January 18, 2018 decision of the Third Department: (1) violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the Due Process Clause of *Article 1, § 6 of the New York State Constitution*; (2) violation of *New York State Judiciary Law § 90(8)*; (3) declaratory judgment that Rules 1.7 and 8.4 are unconstitutionally vague as applied to Plaintiff; and (4) a declaratory judgment determining that Plaintiff did not violate Rule 8.4(d). *See* Dkt. No. 1-1 at ¶¶ 58-113. Moreover, Plaintiff seeks the following relief: (1) an Order directing that the discipline of Plaintiff as set forth in the Memorandum and Order be struck from the record with publication revoked and/or sealed; or, alternatively, an Order compelling the New York State Court of Appeals to hear Plaintiff's appeal of the Memorandum and Order; or, in the alternative, (2) an Order certifying the questions raised herein to the Court of Appeals for determination; (3) an Order granting declaratory judgment determining that Plaintiff did not violate 22 NYCRR 1200 Rules 1.7(a)(1) and Rule 8.4(d) or any other section of law, rule, or regulation; (4) an Order awarding all costs and disbursements, including but not limited to reasonable attorney's fees, incurred by Plaintiff in defense of the underlying disciplinary proceedings and in prosecution of the within action; and (5) an Order Granting such other and further relief as this Court deems just fair and proper.

**\*3** In their motion to dismiss, Defendants argue that Plaintiff's complaint must be dismissed because (1) the Court lacks subject-matter jurisdiction over this litigation under the Eleventh Amendment and the *Rooker-Feldman* doctrine and (2) Plaintiff's claims are barred by the doctrines of *res judicata* and collateral estoppel. *See* Dkt. No. 13-1. In response, Plaintiff contends that Defendants have attempted to improperly cast his claims as simply an effort to relitigate the state court findings. *See* Dkt. No. 15 at 6. Plaintiff clarifies that he is not asking the Court to substitute its judgment for that of the Appellate Division; rather, he contends that he was denied procedural due process and he is challenging the rules applied to his matter as vague and facially invalid. *See id.* Moreover, Plaintiff makes clear that he is only seeking prospective injunctive and declaratory relief to prevent the state's ongoing violation of due process and enforcement of rules that are unconstitutional. *See id.* As such, Plaintiff argues

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 51 of 63

Mann v. New York State Court of Appeals, Not Reported in Fed. Supp. (2021)

2021 WL 5040236

that his claims are not barred by the Eleventh Amendment, the *Rooker-Feldman* doctrine, or the doctrines of *res judicata* and collateral estoppel. *See id.*

## III. DISCUSSION

### A. Legal Standard

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Dutrow v. New York State Gaming Commission,* No. 13-cv-996, 2014 WL 11370355, *3 (E.D.N.Y. July 29, 2014), aff'd,* 607 Fed. Appx. 56 (2d Cir. 2015). A motion seeking dismissal under the Eleventh Amendment or the *Rooker-Feldman* doctrine is properly considered under Rule 12(b)(1). *See Long Island Pure Water Ltd. v. Cuomo,* 375 F. Supp. 3d 209, 215 (E.D.N.Y. 2019); *Hylton v. J.P. Morgan Chase Bank, N.A.,* 338 F. Supp. 3d 263, 273 (S.D.N.Y. 2018). A motion seeking dismissal "invoking res judicata and collateral estoppel are properly brought under Rule 12(b)(6)." *Marcelin v. Cortes-Vazquez,* No. 09-cv-4303, 2010 WL 5665037, *2 (E.D.N.Y. Dec. 9, 2010) (citations omitted).

#### 1. Rule 12(b)(1)

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([*i.e.,*] subject-matter jurisdiction)." *Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 430-31 (2007) (citation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). When subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.' " *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003) (quoting *Lunney v. United States,* 319 F.3d 550, 554 (2d Cir. 2003)). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Australia Bank Ltd.,* 547 U.S. 167, 170 (2d Cir. 2008) (citing *Makarova,* 201 F.3d at 113).

In reviewing a motion to dismiss under Rule 12(b)(1), the court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir. 2004). The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [ ] may not rely on conclusory or hearsay statements contained in the affidavits." *Id.* In resolving a Rule 12(b)(1) motion, a court may also "consider 'matters of which judicial notice may be taken.' " *Greenblatt v. Gluck,* No. 03 Civ. 597, 2003 WL 1344953, *1 n.1 (S.D.N.Y. Mar. 19, 2003) (quoting *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir. 1992)).

#### 2. Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir. 2002)).

**\*4** To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' ' " *Id.* (quoting *Twombly,* 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 52 of 63

Mann v. New York State Court of Appeals, Not Reported in Fed. Supp. (2021)

2021 WL 5040236

"not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

**B. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The Supreme Court has long held that the Eleventh Amendment bars suits against a state by one of its own citizens, unless (1) the state consents to be sued, or (2) Congress validly abrogates the state's immunity." *Ross v. City Univ. of New York*, 211 F. Supp. 3d 518, 525 (E.D.N.Y. 2016) (citing *Coll. Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S. Ct. 2219, 144 L. Ed. 2d 605 (1999)). But the Supreme Court established a third exception in *Ex parte Young*, 209 U.S. 123 (1908), allowing "prospective injunctive relief ... against individuals being sued in their official capacities in order to correct an ongoing violation of federal law." *JTE Enterprises, Inc. v. Cuomo*, 2 F. Supp. 3d 333, 340 (E.D.N.Y. 2014) (citing *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)).

In their motion to dismiss, Defendants contend that it is well settled that Section 1983 did not abrogate the states' immunity and New York has not consented to suit in federal court. *See* Dkt. No. 13-1 at 12-13. Since all named Defendants are considered arms of the state, Plaintiff's claims must be dismissed. *See id.* In response, Plaintiff contends that the *Ex parte Young* exception applies to this matter since he is seeking "to compel a state official to comply with federal law by employing prospective injunctive and declaratory relief." Dkt. No. 15 at 21.

The Court agrees with Defendants that the New York State Court of Appeals, the Appellate Division, Third Department, and the Attorney Grievance Committee of the Third Department are all arms of the state which benefit from Eleventh Amendment immunity. *See Napolitano v. Saltzman*, 315 Fed. Appx. 351, 351 (2d Cir. 2009) (holding that the district court correctly found that the Eleventh Amendment barred the plaintiff's claims against the Appellate Division, the Grievance Committee, and the individual defendant named in his official capacity as counsel to the Grievance Committee); *Abrahams v. Appellate Div. of Supreme Court*, 474 F. Supp. 2d 550, 556 (S.D.N.Y. 2007), *aff'd*, 311 Fed. Appx. 474 (2d Cir. 2009); *Bloom v. N.Y.S. Unified Ct. Sys.*, No. 19-cv-7115, 2020 WL 6118828, *3 (E.D.N.Y. Oct. 16, 2020). Since New York has not consented to be sued, and because Section 1983 did not abrogate New York's Eleventh Amendment immunity, Plaintiff's claims can only proceed if the *Ex parte Young* exception applies.

In his complaint, Plaintiff seeks the following relief:

a) An order and judgment declaring that with respect to Plaintiff, Defendants did engage in:

**\*5** i. Violation of Due Process Clause of 14th Amendment of U.S. Constitution;

ii. Violation of Due Process Rights Article 1 § 6 of the NYS Constitution[;]

iii. Violation of N.Y.S. Judiciary Law § 90(8).

b) An order and judgment declaring 22 NYCRR 1200 Rule 1.7(a)(1) and 8.4(d) as applied unconstitutional and void for vagueness;

c) An order and judgment declaring that the Memorandum and Order of the Appellate Division is not supported by preponderance of evidence or substantial evidence;

d) An order and judgment declaring that the Appellate Division violated Plaintiff's right to privacy in relation to private discipline in violation of § 90(10) of the N.Y.S. Judiciary Law, 22 NYCRR § 1240.18 and the former 22 NYCRR § 806.4(c)(5);

e) An order and judgment directing that the discipline of Plaintiff be struck of record with publication revoked and/or sealed; or compelling the New York State Court of Appeals to hear Plaintiff's appeal of the Memorandum and Order[.]

Dkt. No. 1-1 at 18-19.

As noted by Defendants, each prayer for relief in Plaintiff's complaint seeks relief from judicial determinations made prior to commencement of this lawsuit. There is no request by Plaintiff for an order enjoining Defendants from taking any future or prospective action against him. As such, it is clear from the face of the complaint that the *Ex parte Young* exception does not apply.

Additionally, the Supreme Court has made clear that this exception only contemplates action brought against individual defendants in their official capacities, and "has no application in suits against the States and their agencies,

2021 WL 5040236

which are barred regardless of the relief sought." *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). In his complaint, Plaintiff has not named any individuals in their official capacities who are responsible for the enforcement of the laws at issue, which further highlights the inapplicability of *Ex parte Young*.

Based on the foregoing, the Court grants Defendants' motion to dismiss.

## C. *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 281 (2005). For the *Rooker-Feldman* doctrine to apply, the defendant must satisfy the following four requirements: "First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court judgment must have been rendered before the district court proceedings commenced." *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 94 (2d Cir. 2015). "While all four requirements must be met in order for *Rooker-Feldman* to act as a jurisdictional bar, [the Second Circuit has] held that the second requirement – that the plaintiff complains of an injury *caused by* a state-court judgment – is the core requirement from which the other *Rooker-Feldman* requirements derive." *Sung Cho v. City of New York*, 910 F.3d 639, 646 (2d Cir. 2018) (emphasis in original).

**\*6** Here, (1) the Appellate Division rendered Plaintiff a "state-court loser" on January 18, 2018, when it confirmed the referee's report and disciplined Plaintiff; (2) Plaintiff's injuries trace to that discipline; (3) the relief Plaintiff seeks specifically invites this Court to review and reject the decision of the Appellate Division; and (4) the Appellate Division's decision was rendered before Plaintiff commenced this action. Courts have found claims of this nature barred by the *Rooker-Feldman* doctrine. *See Abrahams v. Appellate Div. of Supreme Court*, 311 Fed. Appx. 474, 475 (2d Cir. 2009); *Bloom*, 2020 WL 6118828, at \*6; *see also Sowell v. Tinley Renehan & Dost, LLP*, 807 Fed. Appx. 115, 119 (2d Cir. 2020) (holding that the plaintiffs' claims, alleging that prior state court rulings interpreting Connecticut's professional conduct rule governing communication with a

person represented by counsel denied their rights to free speech, due process, and equal protection, were barred under the *Rooker-Feldman* doctrine, since the claims did not allege any injury traceable to the rule itself, but to state courts' application of rule to the plaintiffs' particular state case).

In his response, Plaintiff attempts to avoid dismissal under the *Rooker-Feldman* doctrine by arguing that "facial challenges to rules and doctrines used in state court determinations is not barred by *Rooker-Feldman*, so long as 'plaintiffs d[o] not seek review of the [rules' and doctrines'] application in a particular case.' " Dkt. No. 15 at 12 (quotation omitted). While Plaintiff is correct regarding facial challenges, nothing in his complaint can reasonably be interpreted as a facial challenge to any particular rule or regulation. As noted above, each prayer for relief makes specific reference to the rules and regulations *as applied* to his state-court case and Plaintiff, who is represented by counsel, cannot amend his complaint through his response to raise such a claim. *See* Dkt. No. 1-1 at 18-19; *see also Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (2d Cir. 1995) (looking to the relief requested by the plaintiff in determining whether his claim was barred by the *Rooker-Feldman* doctrine). [1]

> [1] Even assuming that Plaintiff is attempting a facial challenge to Rules 1.7(a)(1) and 8.4(d), his complaint fails to allege any facts that he is or will be subject to the application of these Rules. Because Plaintiff fails to allege any facts demonstrating an injury in fact that is "actual or imminent," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), or "clearly impending," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), he lacks standing to bring these claims. *See Sowell*, 807 Fed. Appx. at 120 (holding that the plaintiff attorney lacked standing for a facial challenge to the state's rules of conduct where he failed to allege facts that he was or imminently would be subject to the application of the rules at issue).

As such, the Court finds that Plaintiff's complaint is subject to dismissal on this alternative ground.

## D. *Res Judicata* and Collateral Estoppel

*Res judicata* provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). As the Second

Case 5:24-cv-01014-BKS-MJK   Document 4   Filed 08/23/24   Page 54 of 63

Mann v. New York State Court of Appeals, Not Reported in Fed. Supp. (2021)

2021 WL 5040236

Circuit explained in *Marcel Fashions Group, Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102 (2d Cir. 2015):

> The term *res judicata*, which means essentially that the matter in the controversy has already been adjudicated, encompasses two significantly different doctrines: claim preclusion and issue preclusion.... Under *claim preclusion*, "a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." ... The doctrine precludes not only litigation of claims raised and adjudicated in a prior litigation between the parties (and their privies), but also of claims that might have been raised in the prior litigation but were not.... The doctrine of *issue preclusion*, in contrast, "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."

**\*7** *Marcel*, 779 F.3d at 107-08 (internal citations and quotations omitted).

*Res judicata* applies where "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000) (citation omitted).

In the present matter, even assuming Plaintiff's claims were not subject to dismissal for lack of subject matter jurisdiction, dismissal would still be warranted. In response to Defendants' motion, Plaintiff contends that *res judicata* is inapplicable because "[t]he federal remedy under Section 1983 'is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.' " Dkt. No. 15 at 22-23 (quoting *Monroe v. Pape*, 365 U.S. 167, 183 (1961)). Moreover, Plaintiff contends that simply because his constitutional claims might have been raised before the state court does not prevent him from doing so in the present matter. *See id.* at 23.

Initially, the Court notes that the case relied on by Plaintiff, *Monroe v. Pape*, does not support his position. Rather, that case merely provides that an individual does not have to first look to state law before seeking relief under Section 1983, a proposition which is not in dispute. The issue here, however, is the fact that Plaintiff could have raised his constitutional arguments before the Appellate Division and failed to do so. Plaintiff had a full and fair opportunity to litigate the issues raised in this case during the pendency of the state court proceedings, yet failed to do so. As such, Plaintiff's claims would be subject to dismissal on this alternative ground. *See Sassower v. Mangano*, 927 F. Supp. 113, 120 (S.D.N.Y. 1996) (holding that the plaintiff attorney's claims challenging his suspension from the practice of law by the Second Department were subject to dismissal under the doctrine of *res judicata*).

Accordingly, the Court finds that, assuming the Court had subject matter jurisdiction over Plaintiff's claims, they would be subject to dismissal on this alternative ground.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, the Court hereby

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 13) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5040236

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 235523
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Loriann DEUEL and Lorraine Deuel, Plaintiffs,
v.
Frank T. DALTON; State of New York; New York
State Unified Court System; Philip J. Danaher,
Esq., as the attorney appointed to act as Law
Guardian for BMD; Catherine Cholakis, as the
presiding justice of the Family Court assigned to
this proceeding; John & Jane Does 1–100, whose
identities may or may not be known but necessary
parties to these proceedings; ABC Corp's 1–100, those
entities whose identities are currently unknown, but
necessary parties to these proceedings, Defendants.

No. 1:11–CV–0637 (GTS/RFT).
|
Jan. 25, 2012.

**Attorneys and Law Firms**

Loriann and Lorraine Deuel, Unionville, TN, pro se.

### *DECISION and ORDER*

**DECISION and ORDER**

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil
rights action filed by Loriann Deuel and Lorraine
Deuel ("Plaintiffs") against the above-captioned defendants
(together "Defendants"), are (1) United States Magistrate
Judge Randolph F. Treece's Report–Recommendation
recommending that Plaintiff's Complaint be dismissed, and
(2) Plaintiffs' Objections to that Report–Recommendation.
(Dkt.Nos.4, 5.) For the following reasons, the Report–
Recommendation is accepted and adopted, and Plaintiffs'
Complaint is dismissed.

## I. RELEVANT BACKGROUND

### A. Plaintiffs' Complaint

On June 8, 2011, Plaintiffs filed their Complaint in this
action. (Dkt. No. 1.) Generally, in their Complaint, Plaintiffs
allege that Defendants violated their constitutional right to

due process and equal protection under 42 U.S.C. § 1983
in connection with various custody proceedings involving
Plaintiff Loriann's minor child, BMD. (Dkt. No. 1 at 4.)

More specifically, construed with the utmost of special
liberality, Plaintiffs' Complaint asserts the following six
claims against Defendants: (1) Defendants New York
State Unified Court System and Cholakis violated, and/
or conspired to violate, Plaintiffs' due process rights under
the Fourteenth Amendment by, *inter alia,* improperly (a)
exercising jurisdiction over Plaintiffs during various custody
proceedings from 2002 to 2004, where no such jurisdiction
existed, (b) failing to notify her of various of those court
proceedings, (c) holding various of those proceedings in
her absence, and (d) awarding Defendant Dalton custody of
BMD, even though Defendant Dalton had not established
paternity; (2) Defendants New York State Unified Court
System and Cholakis violated, and/or conspired to violate,
Plaintiffs' equal protection rights under the Fourteenth
Amendment by denying Plaintiffs their parental and familial
rights; (3) Defendants New York State Unified Court
System, Cholakis and Danaher committed, and/or conspired
to commit, fraud against Plaintiffs; (4) Defendants New York
State Unified Court System, Cholakis and Danaher suborned,
and/or conspired to suborn, perjury by Defendant Dalton;
(5) Defendant Cholakis, New York State Family Court
Judge committed judicial misconduct against Plaintiffs; and
(6) Defendant Danaher committed professional misconduct
against Plaintiffs. (Dkt. No. 1 at 30–34.)

For a more detailed recitation of Plaintiffs' claims, and the
factual allegations giving rise to those claims, reference is
made to Plaintiffs' Complaint and Magistrate Judge Treece's
Report–Recommendation in their entireties. (Dkt.Nos.1, 4.)

### B. Magistrate Judge Treece's Report–
Recommendation

On July 19, 2011, Magistrate Judge Treece issued a Report–
Recommendation recommending that Plaintiffs' Complaint
be dismissed for the following reasons: (1) the Court lacks
subject-matter jurisdiction over domestic relations matters,
including those related to child custody; (2) Plaintiffs' claims
are barred by the applicable statute of limitations; and (3)
Plaintiff has failed to state a claim upon which relief can be
granted pursuant to 28 U.S.C. § 1915(e)(2). (*See generally*
Dkt. No. 4.)

### C. Plaintiffs' Objections to the Report–Recommendation

**\*2** On August 1, 2011, Plaintiffs filed their Objections to the Report–Recommendation. (Dkt. No. 5.) Generally, liberally construed, Plaintiffs' Objections argue that Magistrate Judge Treece made the following errors: (1) the Court does have subject-matter jurisdiction in this case because the relief requested does not require the Court to "become enmeshed in factual disputes" (Dkt. No. 5 at 3); (2) Plaintiffs have stated a claim under 42 U.S.C. § 1983 because they have adequately alleged Defendants Dalton and Danaher are state actors (Dkt. No. 5 at 4); and (3) the action is not barred by the applicable statute of limitations because the state court "matter has been ongoing for the past seven years." (Dkt. No. 5 at 4.)

In addition, in their Objections, Plaintiffs seek leave to file an Amended Complaint, which Plaintiffs purport would do the following: (1) remove Defendant Cholakis from this action "pursuant to judicial immunity statutes"; (2) "remove the habeas corpus request"; and (3) include recent civil rights violations in an effort "to clear up misunderstandings regarding jurisdiction, timeliness, and the statement of claims." (Dkt. No. 5 at 6.)

## II. RELEVANT LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When a specific objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, the Court "may ... receive further evidence...." 28 U.S.C. § 636(b) (1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2]

[1]   *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve

this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2]   *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a general objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a clear error review. Fed.R.Civ.P. 72(b)(2) and (3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. [3] Similarly, when an objection merely reiterates the same arguments made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation to a clear error review. [4] Finally, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear

error. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. [5]

[3]     See also Brown v. Peters, 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999); Vargas v. Keane, 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), cert. denied, 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

[4]     See Mario, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); accord, Praileau v. Cnty. of Schenectady, 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010 (McAvoy, J.); Hickman ex rel. M.A.H. v. Astrue, 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); Almonte v. N.Y.S. Div. of Parole, 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

[5]     See also Batista v. Walker, 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous." [internal quotations marks omitted.] ).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**B. Legal Authority for Reviewing a Complaint *Sua Sponte***

**\*3**   Under the circumstances, the Court's authority to *sua sponte* review Plaintiffs' Complaint stems from three separate sources. (1) Fed.R.Civ.P. 12(h)(3), which provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss that action"; (2) 28 U.S.C. § 1915(e)(2) (B), which provides that, when a plaintiff seeks to proceed *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that—... the action (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief"; and (3) the Court's inherent power to manage its docket.

With regard to the second of the three above-described authorities, the Court notes that the dismissal of an action as barred by the applicable statute of limitation may fall within the ambit of the Court's power to dismiss a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e). [6] In addition, the dismissal of an action as duplicative has been found to fall within the ambit of the Court's power to dismiss a complaint which is frivolous or malicious pursuant to 28 U.S.C. § 1915(e). [7]

[6]     See Pino v. Ryan, 49 F.3d 51, 54 (2d Cir.1995) ("Nothing ... suggests that an affirmative defense appearing on the face of a complaint may not be the basis for a *sua sponte* dismissal under section 1915(d) [section 1915(e) as amended] prior to service of te complaint."); accord, Pratts v. Coombe, 49 F. App'x 392, 393 (2d Cir.2003).

[7]     See Bailey v. Johnson, 846 F.2d 1019, 1021 (5th Cir.1988) (holding that a complaint that repeats pending or previously litigated claims "may be considered abusive" and dismissed under the authority of Section 1915[e] ); Buckenberger v. Reed, 10–CV–0856, 2010 WL 1552672, at *1 (E.D.La. Mar.16, 2010) (recommending dismissal of complaint asserting claims which were duplicative of those in a pending action as "malicious"); Smith v. Ferrell, 09–CV–0466, 2010 WL 653798, at *2–3 (S.D.Ala. Feb.18, 2010) (dismissing action because claims were duplicative of those in another pending action); Williams v. Bunn, 06–CV–0466, 2007 WL 1703816, at *2 (W.D.N.Y. Jun.7, 2007) (dismissing "religious

2012 WL 235523

claim" with prejudice because it was "repetitive of a claim twice brought previously and dismissed for plaintiff's failure to serve); *Hahn v. Tarnow,* 06–CV–12814, 2006 WL 2160934, at *1 (E.D.Mich. July 31, 2006)* (dismissing complaint as "repetitive, malicious and frivolous, and duplicative"); *Blake v. Bentsen,* 95–CV–2227, 1995 WL 428694, at *2 (E.D.N.Y. Jul.11, 1995)* (dismissing "repetitious litigation" as abusive and malicious); *Denton v. Hernandez,* 504 U.S. 25, 30, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992)* (recognizing Congress's concern in 28 U.S.C. § 1915 that "a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits.").

With regard to the third of the three above-described authorities, it is well settled that a district court has the power to *sua sponte* dismiss *pro se* complaint based on frivolousness. *See, e.g., Fitzgerald v. First E. Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000)* (recognizing that district court has power to *sua sponte* dismiss *pro se* complaint based on frivolousness notwithstanding fact that plaintiff has paid statutory filing fee). It is also is well settled that "[a]s part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000); *see also Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)* ("As between federal district courts, ... though no precise rule has evolved, the general principle is to avoid duplicative litigation."). The power to dismiss a duplicative lawsuit is meant to foster judicial economy and the "comprehensive disposition of litigation." *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952).[8] The doctrine is also meant to protect parties from "the vexation of concurrent litigation over the same subject matter." *Adam v. Jacob,* 950 F.2d 89, 93 (2d Cir.1991).[9]

[8]    The Second Circuit affirmed the dismissal of an action which "substantially duplicate[d]" the conspiracy claim asserted in a prior action, notwithstanding the fact that the conspiracy claim in the first action was dismissed as insufficiently pleaded and plaintiff was afforded an opportunity to amend, because "[plaintiff's] recourse is to appeal that decision after judgment is

entered in that case, not to file a duplicative second complaint." *Brown v. Plansky,* 24 F. App'x 26, 28 (2d Cir.2001).

[9]

    The rule against duplicative litigation is distinct from, but related to, the doctrine of claim preclusion or *res judicata,* and the two doctrines serve some of the same policies. As the Supreme Court stated over 100 years ago in *United States v. The Haytian Republic,* 154 U.S. 118, 14 S.Ct. 992, 38 L.Ed. 930 (1894)*, "[T]he true test of the sufficiency of a plea of 'other suit pending' in another forum [i]s the legal efficacy of the first suit, when finally disposed of, as 'the thing adjudged,' regarding the matters at issue in the second suit." *Id.* at 124.

### C. Legal Standard Governing Dismissal Based on Lack of Subject–Matter Jurisdiction

Magistrate Judge Treece correctly recited the legal standard governing a dismissal based on lack of subject-matter jurisdiction in his Report–Recommendation. (Dkt. No. 4 at 2–3.) As a result, that standard is incorporated herein by reference in this Decision and Order.

### D. Legal Standard Governing Dismissal Based on Expiration of Statute of Limitations

*4   Magistrate Judge Treece correctly recited the legal standard governing a dismissal based on the expiration of the relevant statute of limitations in his Report–Recommendation. (Dkt. No. 4 at 3–4.) As a result, that standard is incorporated herein by reference in this Decision and Order.

### E. Legal Standard Governing Dismissal Based on Failure to State a Claim

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008)* (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because Plaintiffs' Complaint is dismissed based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires

that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

**\*5** Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69.

Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

**\*6** This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [10] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements

2012 WL 235523

set forth in *Fed.R.Civ.P. 8, 10* and *12* are procedural rules that even *pro se* civil rights plaintiffs must follow. [11] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [12]

[10]   See *Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[11]   See *Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[12]   It should be emphasized that *Fed.R.Civ.P. 8*'s plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under *Fed.R.Civ.P. 8(a)(2). Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**F. Legal Standard Governing Dismissal Based on Duplicative Nature of Action**

Although no precise test has been articulated for determining whether actions are duplicative, "the general rule is that a suit is duplicative of another suit if the parties, issues and available relief do not significantly differ between the two actions." *I.A. Durbin, Inc. v. Jefferson Nat. Bank,* 793 F.2d 1541, 1551 (11th Cir.1986). "Courts generally look to the identity of the parties, legal claims, factual allegations including temporal circumstances, and the relief sought to determine if the complaint is repetitive or malicious." *Hahn,* 2006 WL 2160934, at *3.

It is worth noting that district courts have broad discretion in determining whether an action should be dismissed as duplicative. *Lopez v. Ferguson,* 361 F. App'x 225, 226 (2d Cir.2010) (affirming dismissal of action as duplicative of a pending class action as to which plaintiff fell within the certified class). [13] There are several approaches to the proper disposition of duplicative actions, including stay of the second action, dismissal without prejudice, and consolidation. *Curtis,* 226 F.3d at 138. In addition, "simple dismissal of the second suit is another common disposition because plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Id.* at 138–39. [14]

[13]   See also *Flemming v. Wurzberger,* 322 F. App'x 69, 71 (2d Cir.2009); *Curtis,* 226 F.3d at 138.

[14]   See also *Zerilli v. Evening News Ass'n,* 628 F.2d 217, 222 (D.C.Cir.1980); *Walton v. Eaton Corp.,* 563 F.2d 66, 70 (3d Cir.1977) (*en banc* ).

**G. Legal Standard Governing Dismissal Based on Doctrines of Res Judicata and/or Collateral Estoppel**

Claim preclusion, also sometimes referenced to as res judicata, requires that a final judgment of an action on the merits be given preclusive effect, barring parties, as well as those in privity with them, from relitigating claims which were or could have been raised in the prior action. *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286–87 (2d Cir.2002); *see also Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 28 (2d Cir.1986) (citing *Federated Dep't Stores v. Moitie,* 452 U.S. 394, 398 [1981] ), *overruled on other grounds, Taylor v. Vermont Dep't of Educ.,* 313 F.3d 768 (2d Cir.2002).

Issue preclusion, a more narrow doctrine often referred to as collateral estoppel, bars a party that has had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been actually and necessarily decided against that party or its privy. *McKithen v. Brown,* 481 F.3d 89, 105 (2d Cir.2007); *Marvel,* 310 F.3d at 288–89.

## III. ANALYSIS

**\*7**  As stated above in Part I.C. of this Decision and Order, Plaintiffs' Objections argue that Magistrate Judge Treece made the following errors: (1) the Court does have subject-matter jurisdiction in this case because the relief requested does not require the Court to "become enmeshed in factual disputes" (Dkt. No. 5 at 3); (2) Plaintiffs, indeed, stated a claim under 42 U.S.C. § 1983 because they have adequately alleged Defendants Dalton and Danaher are state actors (Dkt. No. 5 at 4); and (3) the action is not time-barred because the state court "matter has been ongoing for the past seven years." (Dkt. No. 5 at 4.)

In accordance with N.D.N.Y. L.R. 72.1(c), the Court finds the first and second objections are specific in nature because Plaintiffs identified the portions of Magistrate Judge Treece's Report–Recommendation to which they object with particularity, and Plaintiffs cited (albeit improper) legal authority in an effort to support their objections. (*See generally* Dkt. No. 5.) As a result, the Court subjects those portions of Magistrate Judge Treece's Report–Recommendation to which Plaintiffs object to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1) (C).

Plaintiffs' third objection, however, is only general in nature. Although Plaintiffs specifically identify the portion of the Report–Recommendation to which they object, they fail to provide any legal basis for the objection. (*See generally* Dkt. No. 5 at 4–6 .) As a result, the Court reviews that portion of Magistrate Judge Treece's Report–Recommendation to which Plaintiffs object for only clear error. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C).

After carefully subjecting Magistrate Judge Treece's Report–Recommendation to the appropriate level of review, the Court finds no error in the Report–Recommendation. Magistrate Judge Treece employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report–Recommendation is accepted and adopted in its entirety for the reasons stated therein. The court would add only five brief points.

First, those portions of Magistrate Judge Treece's Report–Recommendation that the Court has reviewed only for clear error (e.g., the holding that Plaintiffs' claims are barred by the statute of limitations) would survive even a *de novo* review.

Second, Plaintiff's argument that the Court need not "become enmeshed in factual disputes" (and thus it does have subject-matter jurisdiction in this case) is without merit for several reasons. For example, to determine whether Plaintiffs' due process rights were violated, the Court would inevitably have to engage in a factual inquiry regarding the custodial placement of BMD with Defendant Dalton. The Court might, for example, need to evaluate the same facts the state court did in making its custody determination in the first place. Doing so, however, would violate the general rule that domestic relations matters are primarily matters for state courts.

**\*8**  Third, Plaintiffs' action appears largely duplicative of two previously filed actions: (1) *Deuel v. Dalton,* 06–CV–0234, Complaint (M.D. Tenn. filed March 23, 2006); and (2) *Deuel v. Dalton,* 11–CV–0466, Complaint (M.D. Tenn. filed May 16, 2011). While the first of these two actions appears to have been dismissed only without prejudice, [15] the second of these two actions is still pending in the Middle District of Tennessee-contributing to the waste of judicial resources, and running the risk of inconsistent rulings and preclusion by collateral estoppel. [16]  The Court notes that in May 20011 an Order was issued in the second action, referring the case to a magistrate judge for a review of whether the action is frivolous. *Deuel v. Dalton,* 11–CV–0466, Order (M.D. Tenn. filed May 18, 2011) (Trauger, J.). As a result, this action is dismissed based also on this alternative ground.

[15]    *Deuel v. Dalton,* 06–CV–0234, Memorandum and Order (M.D. Tenn. filed August 15, 2006) (Trauger, J.). *See also Hernandez v. Conriv Realty Assocs., 182 F.3d 121, 123 (2d Cir.1999)* ("[W]here a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice.").

[16]    For example, both the second action and the action before this Court present claims against Frank Dalton, John and Jane Does 1–100, and ABC Corp's 1–100, for violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment (as well as fraud and conspiracy), arising from, *inter alia,* the unfavorable rulings Plaintiff Loriann Deuel received in child-custody proceedings in New York State court from 2002 to 2004 due to the alleged misconduct of Dalton, Family Court Judge Catherine Cholakis and Law Guardian Phillip J. Danaher. *See Deuel v. Dalton,* 11–CV–0466, Complaint, at 4–5, 9–12, 15–18, 30–32 (M.D. Tenn. filed May 16, 2011).

Fourth, Plaintiffs' claims against New York State Unified Court System and Cholakis are barred by the Eleventh Amendment and the doctrine of absolute immunity.[17] Similarly, Plaintiffs' claims against Defendant Danaher are barred by the doctrine of qualified immunity (if not also the doctrine of absolute immunity). Moreover, Plaintiffs' Complaint does not allege facts plausibly suggesting that Defendant Dalton is a state actor for purposes of 42 U.S.C. § 1983. Furthermore, Plaintiffs' Complaint does not allege facts plausibly suggesting the personal involvement of Defendants John and Jane Does 1–100 and ABC Corp's 1–100 in any of the violations alleged. (*See generally* Dkt. No. 1.) Finally, Plaintiffs' Complaint does not allege facts plausibly suggesting that Plaintiff Lorraine Deuel has standing to assert any claims in this action (or even that she bears any familial or custodial relationship to BMD). (*Id.*)[18] Simply stated, additional pleading defects plague Plaintiffs' claims against each of the Defendants in this action, as well as each of the claims asserted by Plaintiff Lorraine Deuel. As a result, this action is dismissed based also on this alternative ground.

[17]    The Court notes that, in their Objections and Complaint, Plaintiffs' acknowledge that (1) their claims against Defendant Cholakis are barred by the doctrine of absolute immunity, and (2) their claims against Defendant New York State Unified Court System are based on their claims against Defendant Cholakis (pursuant to the doctrine of respondeat superior). (Dkt. No. 5, at 6; Dkt. No. 1, at 31.)

[18]    The Court notes that Plaintiffs' argument in their Objections that Lorraine Deuel was a party to "a recent appellate decision" is simply not sufficient to state the claims in question. (Dkt. No. 5, at 6.)

Fifth, and finally, Plaintiffs' request for leave to amend their Complaint is denied because the numerous pleading defects in Plaintiff's Complaint are substantive rather than formal.[19] As a result, the Court sees no need to *sua sponte* grant Plaintiffs leave to amend those claims before it dismisses them.[20]

[19]    For example, lack of subject-matter jurisdiction and the expiration of the statute of limitations are substantive defects. *See U.S. ex rel. Phipps v. Comprehensive Comty. Dev. Corp.,* 152 F.Supp.2d 443, 455 (S.D.N.Y.2001) ("[I]t is not appropriate to grant Phipps's request [for leave to amend the Complaint] because the Court has determined that it does not have subject matter jurisdiction over this action."); *Chan v. Reno,* 916 F.Supp. 1289, 1302 (S.D.N.Y.1996) ("An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. As will be discussed herein, [the proposed amended complaint] ... presents a non-justiciable claim and fails to present this Court with subject matter jurisdiction. Therefore, because [the proposed amended complaint] would be subject to a successful motion to dismiss ..., amendment would be futile."); *Grace v. Rosenstock,* 228 F.3d 40, 53 (2d Cir.2000) ( "Amendment would likely be futile if ... the claims the plaintiff sought to add would be barred by the applicable statute of limitations."); *accord, In re WorldCom, Inc. Securities Litigation,* 303 F.Supp.2d 385, 390 (S.D.N.Y.2004).

[20]    *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (finding that denial of leave to amend is not abuse of discretion where amendment would be futile); *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) ("Where it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend.") (citations omitted); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied"); *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.").

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–Recommendation (Dkt. No. 4) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is ***DISMISSED*** in its entirety.

*The Court certifies, for purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken from this Decision and Order would not be taken in good faith.*

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 235523

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.